UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF WEST VIRGINIA
HUNTINGTON DIVISION

| | |
|---|---|
| SOLUTIONS ORIENTED ADDICTION RESPONSE WEST VIRGINIA<br>*Plaintiff*,<br>v.<br><br>STATE OF WEST VIRGINIA, PATRICK MORRISEY in his official capacity as Governor of West Virginia, ARVIN SINGH in his official capacity as Secretary of Health, THE WEST VIRGINIA DEPARTMENT OF HEALTH, GORDON C. LANE, JR. in his official capacity as Executive Director of the West Virginia Health Care Authority, ROBERT CHEREN in his official capacity as Chairman of the West Virginia Health Care Authority, and THE WEST VIRGINIA HEALTH CARE AUTHORITY.<br>*Defendants*. | Case No. <u>3:26-cv-00175</u><br><br>COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF |

1

**COMPLAINT**

1)    West Virginia is the epicenter of America's opioid epidemic. In recent years, the opioid crisis has been supercharged by the presence of powerful synthetic opioids like fentanyl.[1] Fortunately, there is effective medication available for people addicted to opioids. Fifty years of scientific research and medical practice support that, for people with opioid use disorder ("OUD"), methadone cuts the risk of death from all causes—including overdose—in half, reduces illicit drug use, reduces infectious disease transmission, and improves quality of life.[2] Methadone, as compared to other treatment medications, is particularly effective for those who are addicted to fentanyl.

2)    But rather than embrace this evidence-based treatment, West Virginia is the *only* state in the nation with a moratorium on new methadone clinics, a cruel irony given that West Virginia has led the nation in the rate of opioid overdose deaths for fourteen of the last fifteen years. It has additionally layered on strict zoning restrictions targeted exclusively at providers of medications for opioid use disorder ("MOUD"), including methadone.

3)    This lawsuit challenges West Virginia's discriminatory and deadly statewide moratorium and zoning restrictions on opioid treatment programs ("OTPs"), which are the only facilities federally authorized to dispense methadone—a proven, life-saving medication—to treat OUD. OUD is a chronic disease of the brain that, if left untreated, often results in death.

---

[1] For purposes of this complaint, references to "fentanyl" are in reference to illicitly manufactured fentanyl in the illicit drug supply, not fentanyl used for medical purposes. For ease of reference, we use the term "fentanyl" rather than "illicitly manufactured fentanyl."

[2] *Medications for Opioid Use Disorder Save Lives* 38-39 (Alan I. Leshner and Michelle Mancher eds., 2019), https://www.nationalacademies.org/read/25310/chapter/4#38 [https://perma.cc/6AV9-9R42].

4)    In 2007, the West Virginia legislature passed a law that instituted "a moratorium on the licensure of new opioid treatment programs which do not have a certificate of need as of the effective date of the enactment of this section." W. Va. Code § 16B-13-12 (the "moratorium"). This moratorium on OTPs is equivalent to a moratorium on any new sources of methadone itself. By singling out and banning only new medical clinics that dispense methadone, while leaving unchanged the requirements governing all other new medical facilities, West Virginia violates Title II of the Americans with Disabilities Act ("ADA") and Section 504 of the Rehabilitation Act ("Section 504").

5)    The results of this moratorium are deadly. For many individuals in West Virginia, methadone is the *only* effective medication available to treat their opioid addiction, especially for those with the most severe OUD and those who frequently use fentanyl. This is because—among other reasons—methadone is the only FDA-approved MOUD that allows those with more severe OUDs to begin taking effective medication without having to go through painful withdrawal symptoms first. Fentanyl withdrawal, compared to heroin withdrawal, typically involves more serious withdrawal symptoms, making avoiding withdrawal altogether even more important. Without access to methadone, individuals with the most severe addiction are less likely to enter treatment and thus are at a dramatically higher risk of fatal overdose.

6)    But because of West Virginia's blanket ban on opening new methadone clinics, many people across the state are unable to receive this lifesaving care. The moratorium has artificially frozen in place the landscape of OTPs in the state: allowing nine—and only nine—clinics to operate in West Virginia for over fifteen years.

7) Broad swaths of the state have no OTPs within an hour's drive. And to receive care at an OTP, individuals must often go to the OTP every day. This makes it practically impossible for many people in West Virginia to receive methadone from the OTP, and maintain a job, take care of their families, and attend to their other responsibilities.

8) West Virginia singles out OTPs, and by extension people with OUD who need methadone, for harsher restrictions by putting a blanket moratorium on new clinics. While other health care providers may open their doors, so long as they comply with relevant local, state, and federal law, no new OTP can open its doors without an act of the West Virginia legislature.

9) The State also singles out OTPs, and individuals with OUD who need methadone, through its zoning law that prohibits new clinics from opening near day care centers or schools. Even if the moratorium were lifted, this restriction limits clinic locations in a way that is not applied to other health care facilities.

10) Under the ADA, people with disabilities shall not "be excluded from participation in or be denied the benefits of the services, programs, activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. Section 504 imposes substantially similar obligations on recipients of federal funds, which includes the State of West Virginia. Courts around the country—including four federal Circuits[3]—have

---

[3] *New Directions Treatment Servs. v. City of Reading*, 490 F.3d 293, 304–05 (3d Cir. 2007) (reversing summary judgment for city and holding that a state statute that bans methadone clinics within 500 feet of schools, churches, residential housing, and other structures facially violates the ADA); *MX Grp., Inc. v. City of Covington*, 293 F.3d 326, 330–31, 342 (6th Cir. 2002) (affirming a post-trial district court order that found a city's revocation of plaintiff methadone clinic's zoning permit and amendment of zoning code that precluded plaintiff from operating in the city violated the ADA); *Bay Area Addiction Rsch. & Treatment, Inc. v. City of Antioch*, 179 F.3d 725, 727–28 (9th Cir. 1999) (holding that an ordinance prohibiting operation of methadone clinics

found that much less sweeping restrictions on OTPs and drug treatment facilities can run afoul of the ADA.

11)    By protecting people with substance use disorder from discrimination, the ADA and Section 504 are aimed at remedying the stigma that often accompanies substance use disorder and at ensuring that people with substance use disorder are able to receive the medical care they need.

12)    Solutions Oriented Addiction Response West Virginia ("SOAR-WV") is West Virginia's largest overdose prevention group. SOAR-WV is a 501(c)(3) organization based in Charleston that works statewide in West Virginia. SOAR-WV works with people who have OUD and other substance use disorders to connect them with treatment, recovery, and overdose prevention services. But because of the methadone moratorium and zoning restrictions, SOAR-WV has had to expend resources it otherwise would not spend, responding to the needs of individuals who cannot receive methadone—and therefore do not receive any effective care—due to this discrimination.

**JURISDICTION AND VENUE**

13)    This Court has federal question jurisdiction pursuant to 28 U.S.C. § 1331 because this action arises under the laws of the United States.

14)    This Court has jurisdiction to grant both declaratory and injunctive relief pursuant to 28 U.S.C. §§ 2201 and 2202.

---

within 500 feet of residential areas can violate the ADA); *see also Innovative Health Sys., Inc. v. City of White Plains*, 117 F.3d 37, 42, 49 (2d Cir. 1997) (affirming a district court preliminary injunction, where city revoked drug treatment facility's permit for stigma-motivated reasons in violation of the ADA).

15) Venue is proper in the U.S. District Court for the Southern District of West Virginia pursuant to 28 U.S.C. § 1391(b)(1), (2) because Defendant is situated in this judicial Division and District, and a substantial part of the events that gave rise to Plaintiff's claims occurred in this judicial Division and District, including through their naloxone distribution activities in Cabell County.

**PARTIES**

16) **Plaintiff Solutions Oriented Addiction Response West Virginia ("SOAR-WV")** is a not-for-profit organization, which operates throughout the state. SOAR-WV's mission is "to save lives, reduce harm and stigma, and empower individuals impacted by drug use through harm reduction, advocacy, and access to life-saving resources—helping build a community rooted in care and dignity for all."

17) SOAR-WV has volunteers and partners in all 55 counties in West Virginia, who are responsible for distributing naloxone—an opioid overdose reversal medication that has saved thousands of lives—in each county, as well as connecting individuals they encounter with treatment and other support services through the peer recovery coaches[4] with whom they work. In many of these counties, volunteers focus their naloxone distribution on areas with high rates of overdose.

---

[4] As defined by the Substance Abuse and Mental Health Services Administration (SAMHSA), "[p]eer specialists in the substance use treatment field have lived experience of recovery from problematic substance use and special training to work with people seeking or in recovery." Substance Abuse and Mental Health Services Administration, *How Can a Peer Specialist Support My Recovery From Problematic Substance Use? For People Seeking or In Recovery* 4 (2023), https://library.samhsa.gov/sites/default/files/peer-specialist-support-my-recovery-pep23-02-01-004.pdf [https://perma.cc/P8N3-6X8Q].

18)    SOAR-WV also hosts monthly mutual aid fairs in Charleston that connect individuals with OUD to treatment, housing, and other social services; regular community clean-ups of syringe litter; and other activities and services to actively maintain relationships with people who have substance use disorder—especially people whom providers in the community have difficulty reaching.

19)    The vast majority of people that SOAR-WV serves have a substance use disorder, and many have OUD. Their OUD is a disability for purposes of the ADA and Section 504.

20)    The individuals SOAR-WV serves are qualified to enjoy the benefits of licensing and zoning of health facilities in the state of West Virginia.

21)    **Defendant State of West Virginia** is a public entity as defined under Title II of the Americans with Disabilities Act, and is responsible for operating its programs, services, and activities in conformity with the ADA. Defendant State of West Virginia receives federal funds[5] and is responsible for complying with Section 504.

22)    **Defendant Patrick Morrisey** is the Governor of West Virginia. Governor Morrisey is chief executive of the State of West Virginia and is "responsible for planning and development of the state's governmental, social, health, economic, environmental and physical resources." W. Va. Code § 8-25-3. Governor Morrisey is sued in his official capacity only.

23)    **Defendant Arvin Singh, EdD** is West Virginia's Secretary of Health. In this capacity, he oversees the West Virginia Health Care Authority, which is responsible for issuing certificates of need to health care entities in West Virginia. Due to the moratorium, the

---

[5] For example, West Virginia receives federal State Opioid Response (SOR) funds. *State Opioid Response*, West Virginia Department of Human Services (last visited March 1, 2026), https://bbh.wv.gov/state-opioid-response-sor [https://perma.cc/VA8W-E4EF].

West Virginia Health Care Authority is prohibited from issuing certificates of need to OTPs. Secretary Singh is sued in his official capacity only.

24) **Defendant West Virginia Department of Health** includes the West Virginia Health Care Authority as a component. The West Virginia Health Care Authority is responsible for issuing certificates of need to health care entities in West Virginia. Due to the moratorium, the West Virginia Health Care Authority is prohibited from issuing certificates of need to OTPs.

25) **Defendant Gordon C. Lane, Jr.** is Interim Executive Director of the West Virginia Health Care Authority, which issues certificates of need to health care entities in West Virginia. Due to the moratorium, Director Lane is prohibited from issuing certificates of need to OTPs. Director Lane is sued in his official capacity only.

26) **Defendant Robert Cheren** is Chairman of the West Virginia Health Care Authority, which issues certificates of need to health care entities in West Virginia. Due to the moratorium, Chairman Cheren is prohibited from issuing certificates of need to OTPs. Chairman Cheren is sued in his official capacity only.

27) **Defendant West Virginia Health Care Authority** is responsible for issuing certificates of need to health care entities in West Virginia. Due to the moratorium, the West Virginia Health Care Authority is prohibited from issuing certificates of need to OTPs.

## LEGAL FRAMEWORK

28) In 1973, Congress enacted Section 504 of the Rehabilitation Act to expand services and employment opportunities available to individuals with disabilities. Pub. L. 93-112, § 2, 87 Stat. 355, 355–56 (1973). In so doing, Congress also prohibited federal funding recipients from discriminating against individuals with disabilities. 29 U.S.C. § 794.

Congress passed the Americans with Disabilities Act in 1990 "to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities." 42 U.S.C. § 12101(b)(1). Congress found that disabilities "in no way diminish a person's right to fully participate in all aspects of society," yet many people with disabilities "have been precluded from doing so because of discrimination." 42 U.S.C. § 12101(a)(1).

29) Through both the ADA and Section 504, Congress prohibited discrimination against individuals with disabilities by covered entities: "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132; *see also* 29 U.S.C. § 794(a).

30) An individual has a disability under the ADA and Section 504 if, in relevant part, they have "a physical or mental impairment that substantially limits one or more major life activities," including but not limited to caring for oneself and thinking. 42 U.S.C. § 12102(1), (2); 29 U.S.C. § 705(9), (20). While the term "individual with a disability" generally does not cover people who currently use drugs, it does include people who are seeking health services or services in connection with drug rehabilitation, regardless of whether they currently use drugs, and people who are in recovery from past drug use. *See* 42 U.S.C. § 12210; 29 U.S.C. § 705(20).

31) A "public entity" includes state governments, as well as any department, agency, or other instrumentality thereof, and it applies to everything that a public entity does, including licensing and regulating health facilities. 42 U.S.C. § 12131(1); 29 U.S.C. § 794(b).

9

32)    Both the ADA and Section 504 prohibit the state of West Virginia from implementing zoning and other legal and regulatory barriers that prevent individuals with disabilities from equal access to the programs, services, and activities of the state of West Virginia, or from using methods of administration that impair accomplishment of the program's objectives.

## STATEMENT OF FACTS

### I.    Opioid Use Disorder is a disease of the brain, and it is treated effectively by medications for opioid use disorder ("MOUD") like methadone.

33)    Opioids are a class of drugs that control pain, cause feelings of pleasure, and inhibit the ability to think, concentrate, and make decisions. Opioids include prescription medications, as well as illicit drugs like heroin and fentanyl. Both prescribed and illicit opioids are highly addictive.

34)    Opioid use disorder ("OUD") is a chronic, progressive disease of the brain. OUD is characterized by symptoms such as "a persistent desire or unsuccessful efforts to cut down or control opioid use"; "craving, or a strong desire or urge to use opioids"; continued opioid use despite negative consequences in one's life; tolerance, meaning the need to take more opioids to achieve the desired effect or a "markedly diminished effect" with use of the same amount; and withdrawal symptoms.[6] OUD often becomes more severe over time, and individuals with OUD are at increased risk of serious physical injury or death, including from overdose.

35)    OUD fundamentally alters the brain in two primary ways. First, the brain releases a huge amount of dopamine when a person takes opioids. The brain of an individual who does

---

[6] American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* 541 (5th ed. 2013).

not have OUD is not exposed to such high levels of dopamine and, as a result, is able to derive pleasure from important daily activities such as eating, self-care, and social activities. But the ability of individuals with OUD to derive pleasure from these daily activities is chemically limited by repeated exposure to extremely high levels of dopamine. Second, as OUD progresses, an individual's tolerance for opioids increases, often requiring higher and/or stronger doses of opioids to allow an individual to feel "normal" and avoid experiencing painful withdrawal symptoms, let alone experience the "high" they once felt.

36) Because these symptoms are due to changes in the brain's circuitry and chemistry, recovery from OUD is not a matter of willpower or work ethic; instead, recovery requires addressing the change in brain chemistry, as well as providing the social supports necessary to make recovery possible. Indeed, one of the primary symptoms of OUD is the continued use of opioids despite negative consequences, due to the intense cravings attendant to OUD.

37) Thus, medication for opioid use disorder is often necessary medical care for individuals with OUD, because the medications can restore the brain's chemistry and allow individuals with OUD to live healthy and fulfilling lives.

38) Due to the changes in brain chemistry, OUD is often unresponsive to treatments not based in medication, like abstinence-only or twelve-step programs. While these approaches may work for some individuals, the scientific and medical consensus is that medications for opioid use disorder—like methadone—are medically necessary and dramatically decrease the risk of relapse, overdose, and death among those with OUD.

**II.     Opioid Use Disorder has caused an epidemic of deaths in West Virginia and across the nation.**

39)    The epicenter of the nation's opioid overdose crisis is West Virginia, which has suffered the highest per-capita rate of opioid overdose deaths in each of the last fifteen years, except for 2019 when it was second in the nation.[7]

40)    In 2024, West Virginia had an opioid overdose death rate double the national average, with 38.6 deaths per 100,000 West Virginians compared to the national average of 16.0 per 100,000.[8]

41)    Since 2008, 11,983 West Virginians have died of an opioid overdose.[9] This is the equivalent of losing every single person who lives in Pendleton and Calhoun County.

42)    Nationwide, OUD has caused an epidemic of overdose deaths over the past 20 years, and overdose is the leading cause of death for Americans aged 18 to 44.[10] Over 700,000 people have died of an opioid overdose in the United States since the year 2000.[11] This

---

[7] *Opioid Overdose Death Rates and All Drug Overdose Death Rates per 100,000 Population (Age-Adjusted)*, Kaiser Family Foundation (last visited March 1, 2026), https://www.kff.org/mental-health/state-indicator/opioid-overdose-death-rates/ [https://perma.cc/ZBP7-NVND].

[8] *Id.*

[9] *Opioid Overdose Deaths and Opioid Overdose Deaths as a Percent of All Drug Overdose Deaths*, Kaiser Family Foundation (last visited March 1, 2026), https://www.kff.org/mental-health/state-indicator/opioid-overdose-deaths [https://perma.cc/CD4M-ZSTB].

[10] *Statement from CDC's National Center for Injury Prevention and Control on Provisional 2024 Overdose Death Data*, Centers for Disease Control and Prevention (May 14, 2025), https://www.cdc.gov/media/releases/2025/2025-statement-from-cdcs-national-center-for-injury-prevention-and-control-on-provisional-2024.html [https://perma.cc/3EYF-4MU4].

[11] *Drug Overdose Deaths: Facts and Figures*, National Institute on Drug Abuse (last visited Mar. 1, 2026), https://nida.nih.gov/research-topics/trends-statistics/overdose-death-rates#Download [https://perma.cc/FSN7-LRQX].

exceeds the number of American soldiers killed in battle in all U.S. wars since World War I.[12]

43)    In 2024, over 53,000 people died of an opioid overdose in the United States, claiming the life of one person approximately every 10 minutes.[13] This exceeds the number of people who died in car crashes in 2024,[14] or the number of people who died of gun violence in 2023.[15]

### III.    The rise of fentanyl has made OUD more deadly, and methadone access even more important.

44)    While the opioid epidemic has been underway since at least 1999, it has proceeded in distinct waves, based on the availability of drugs. First, the prescription drug epidemic started in 1999; next, the rise in heroin overdose deaths started in 2010; finally, the rise in synthetic opioid overdose deaths, caused largely by fentanyl, began in 2013.[16] The drug supply in the last several years is the most potent, and lethal, in the history of the opioid epidemic, making access to methadone more important than ever.

---

[12] *Summary Data*, Defense Casualty Analysis System (last visited Mar. 1, 2026), https://dcas.dmdc.osd.mil/dcas/app/summaryData/casualties/principalWars [https://perma.cc/7BZH-ACEZ].

[13] *Provisional Drug Overdose Death Counts*, Centers for Disease Control and Prevention (last visited Mar. 1, 2026), https://www.cdc.gov/nchs/nvss/vsrr/drug-overdose-data.htm [https://perma.cc/Q7DU-K85E].

[14] *Early Estimate of Motor Vehicle Traffic Fatalities in 2024*, National Highway Traffic Safety Administration (Apr. 2025), https://crashstats.nhtsa.dot.gov/Api/Public/ViewPublication/813710 [https://perma.cc/5Y3B-CCM7].

[15] *What the Data Says About Gun Deaths in the U.S.*, Pew Research Center (Mar. 5, 2025), https://www.pewresearch.org/short-reads/2025/03/05/what-the-data-says-about-gun-deaths-in-the-us/ [https://perma.cc/5Z7Q-FFHV].

[16] *Understanding the Opioid Overdose Epidemic*, Centers for Disease Control and Prevention (June 9, 2025), https://www.cdc.gov/overdose-prevention/about/understanding-the-opioid-overdose-epidemic.html [https://perma.cc/T3XS-GJ96].

45) Fentanyl is especially potent—more than 50 times more powerful than heroin.[17] Just two milligrams of fentanyl can be enough to cause a fatal fentanyl overdose.[18]

46) Because fentanyl is so powerful, even relative to other opioids, it causes individuals who frequently use fentanyl to acquire a high tolerance for opioids—making their addiction more difficult to treat.

47) Fentanyl is ubiquitous in the drug supply today, in West Virginia and across the country. Heroin is rarely found in the drug supply, having been largely supplanted by the much cheaper and more potent synthetic opioid fentanyl.

48) Fentanyl is also sometimes mixed with or disguised as other non-opioid drugs, which means that people who use drugs often don't know what exactly they're getting or how strong their drugs will be. This chaotic drug supply makes it more likely people will overdose on fentanyl.

49) Given the ubiquity and potency of fentanyl, and the unpredictability of the drug supply, it has never been more important to ensure people with OUD have access to methadone.

---

[17] *The Facts About Fentanyl*, Centers for Disease Control and Prevention (May 2024), https://www.cdc.gov/overdose-resources/pdf/CDC_Fentanyl-Fact-Sheet_General_508.pdf [https://perma.cc/2J7H-RZRJ].
[18] *Facts About Fentanyl*, Drug Enforcement Administration (last visited Mar. 1, 2026), https://www.dea.gov/resources/facts-about-fentanyl [https://perma.cc/NNT5-TWS7].

### IV. Methadone is necessary medical care for opioid use disorder, and for some people it is the *only* effective medication for opioid use disorder—especially those with more severe OUD.

50)    Medications for opioid use disorder,[19] in combination with appropriate psychosocial services, are the standard of care to treat opioid use disorder as recognized by the American Society for Addiction Medicine.[20]

51)    There are three FDA-approved MOUDs: methadone, buprenorphine, and naltrexone. The medications are not interchangeable and have different mechanisms of action. Due to various biological and psychological factors, the MOUD that works for one person's treatment may not work for another.

52)    Methadone is the only full agonist MOUD: it fully activates the opioid receptors in the brain. This allows individuals who are currently using opioids like fentanyl to transition to MOUD without suffering the painful and dangerous withdrawal symptoms that dramatically increase the risk of relapse, overdose, and death.

53)    Given the high rates of fentanyl use, for many West Virginians with OUD, methadone is the *only* effective medication.

54)    Buprenorphine, on the other hand, is a partial agonist MOUD, meaning it partially activates and partially blocks the opioid receptors in the brain. Someone first starting to take buprenorphine can have painful withdrawal symptoms, especially if they had been using fentanyl or have severe opioid use disorder.

---

[19] MOUD is also commonly known as medication for addiction treatment or medication-assisted treatment ("MAT"). While MAT refers to a broader range of medications that treat other substance use disorders, MOUD specifically refers to the medications that treat OUD.
[20] *ASAM National Practice Guideline for the Treatment of Opioid Use Disorder 2020 Focused Update*, American Society of Addiction Medicine (2020), https://sitefinitystorage.blob.core.windows.net/sitefinity-production-blobs/docs/default-source/guidelines/npg-jam-supplement.pdf?sfvrsn=a00a52c2_2 [https://perma.cc/R5B6-AYKA].

15

55)    Naltrexone—an antagonist MOUD—fully blocks the opioid receptors in the brain; individuals must first go through painful opioid withdrawal before starting to take naltrexone. Of the three FDA-approved medications, naltrexone has substantially less evidence supporting its effectiveness than methadone and buprenorphine. For instance, unlike the other two, naltrexone has not been shown to have a benefit in reducing mortality.

56)    Methadone, as a full agonist, does not require a patient to be in withdrawal to start treatment, whereas buprenorphine, as a partial agonist, requires moderate to severe withdrawal for initiation. This makes methadone a lower barrier option for individuals with OUD.

57)    Methadone is a long-acting medication, meaning that at a therapeutic dose, it works over the course of a full day. This contrasts with illicit opioids like heroin and fentanyl, which require individuals who use them to use multiple times per day to avoid feeling withdrawal symptoms.

58)    Fentanyl increases tolerance to opioids, which means people who have been using fentanyl need a higher dose of MOUD for it to work. Access to appropriate doses of MOUD is increasingly important given the rise of fentanyl in the drug supply.

59)    A therapeutic dose of methadone does not cause a patient to feel "high," but instead allows them to function in the same manner as someone whose brain chemistry has not been altered by OUD.

60)    Over time, someone taking methadone gradually has less response to and interest in opioids, a process known as "extinction learning." Methadone binds to and blocks the brain's opioid receptors from being stimulated by illicit drugs like fentanyl, preventing

16

patients from experiencing the same high they otherwise would. In other words, methadone makes it much harder to get "high" from using other opioids because the patient's brain is trained to react less to opioids.

61)    Over 50 years of evidence has proven methadone's efficacy. The risk of mortality for people with opioid use disorder in methadone treatment, from all causes including overdose, is less than half that of those not in treatment.[21]

62)    People with OUD who are in methadone treatment are far more likely to remain in recovery longer than those who do not receive treatment. People who take methadone report a higher quality of life than those who do not receive treatment. Methadone lowers the risk of contracting communicable diseases like HIV and Hepatitis C. People who use methadone have a decreased risk of using other drugs and are less likely to commit a crime, compared to those with OUD who do not receive treatment.[22]

63)    WV currently has 30 adult drug courts.[23] Only nine of these drug courts are located in a jurisdiction with one of West Virginia's nine grandfathered OTPs, meaning only 30 percent of drug courts can refer participants to an in-jurisdiction treatment center that offers the full spectrum of MOUD treatment.

---

[21] Thomas Santo Jr., et al., *Association of Opioid Agonist Treatment with All-Cause Mortality and Specific Causes of Death Among People with Opioid Dependence: A Systematic Review and Meta-Analysis*, 78 JAMA Psychiatry 979 (2021), https://doi.org/10.1001/jamapsychiatry.2021.0976 [https://perma.cc/3TT4-XYGL].

[22] *Medications for Opioid Use Disorder Save Lives* 38-39 (Alan I. Leshner and Michelle Mancher eds., 2019), https://www.nationalacademies.org/read/25310/chapter/4#38 [https://perma.cc/6AV9-9R42].

[23] *West Virginia Adult Drug Courts*, W. Va. Judiciary (revised June 27, 2025), https://www.courtswv.gov/sites/default/pubfilesmnt/2026-01/2026-01-26_ADCMap.pdf [https://perma.cc/Z46D-JPME].

**V.      State and national organizations recognize the importance of MOUD.**

64)     The West Virginia Department of Health and Human Resources stated that "[i]nadequate access to [MOUD] arguably is associated with the high overdose death rates that WV has as compared to national rates, and within West Virginia, that some counties have in comparison with state rates."[24]

65)     According to Dr. Matthew Christiansen, former Director of the West Virginia Office of Drug Control Policy, "Methadone is an evidence-based medicine. We know that it works to reduce illicit drug use, and it's something we need to work more on getting access to."[25]

66)     Dr. Steven Loyd, the current director of West Virginia's Office of Drug Control Policy, is also a vocal champion for expanding methadone access. Dr. Loyd, in his own words, "absolutely screamed [his] lungs out here" that more methadone is needed. "It saves lives. That message has got to get out."[26]

67)     The nation's leading medical and scientific organizations, too, have emphasized the vital importance of MOUD, including the American Medical Association,[27] the American

---

[24] W. Va. Dep't of Health and Hum. Res., *Medication Assisted Treatment: An evidence-based pathway to recovery in West Virginia* 6 (May 2018), https://bbh.wv.gov/media/3351/download?inline [https://perma.cc/PK7Q-229J].

[25] Allen Siegler, *As WV Officials Tout Small Reductions in Drug Overdose Deaths, Epidemic Remains at Crisis Levels*, Mountain State Spotlight (Oct. 5, 2022), https://mountainstatespotlight.org/2022/10/05/wv-drug-crisis-opioid-overdose-numbers-still-high/ [https://perma.cc/79FJ-METL].

[26] Erin Beck, *Methadone Treatment Could Stem West Virginia's Overdose Crisis. Lawmakers Won't Allow More Clinics*, Mountain State Spotlight (May 27, 2025), https://mountainstatespotlight.org/2025/05/27/west-virginia-methadone-treatment-fentanyl/ [https://perma.cc/55NU-JPE5].

[27] Am. Med. Assoc., *2025 AMA Report on Substance Use and Treatment: Progress, Policy and Future Directions* 12 (2025), https://www.end-overdose-epidemic.org/sites/end_overdose/files/2026-01/2025-AMA-Report-on-Substance-Use-and-Treatment-Progress-Policy-and-Future-Directions.pdf [https://perma.cc/53FQ-485U] (recommending "actions at the state and federal levels to increase access to methadone").

Society for Addiction Medicine,[28] the Substance Abuse and Mental Health Services Administration of the U.S. Department of Health and Human Services,[29] and the National Institute on Drug Abuse.[30] The World Health Organization lists methadone as an "essential medicine."[31]

68)    Both the Biden[32] and Trump[33] administrations endorsed expansion of access to MOUD—including methadone—as a key strategy to curb overdose death. As Secretary Robert F. Kennedy Jr. said while discussing the Trump Administration's policies on addiction: "We need methadone."[34]

### VI.    Stigma towards MOUD and people with OUD is rampant.

69)    Pervasive stigma against people who use MOUD, particularly methadone and buprenorphine, limits access to these essential medications. As the Fourth Circuit has recognized, stigma "often attaches to" people recovering from drug addiction.[35]

---

[28] Am. Soc'y of Addiction Med., *ASAM National Practice Guideline for the Treatment of Opioid Use Disorder 2020 Focused Update* (2020), https://sitefinitystorage.blob.core.windows.net/sitefinity-production-blobs/docs/default-source/guidelines/npg-jam-supplement.pdf?sfvrsn=a00a52c2_2 [https://perma.cc/R5B6-AYKA].
[29] *Substance Use Disorder Treatment Options*, Substance Abuse and Mental Health Servs. Admin. (last visited Mar. 1, 2026), https://www.samhsa.gov/substance-use/treatment/options [https://perma.cc/9CWG-9232].
[30] *Medications for Opioid Use Disorder*, Nat'l Inst. on Drug Abuse (last visited Mar. 1, 2026), https://nida.nih.gov/research-topics/medications-opioid-use-disorder [https://perma.cc/7EUJ-K433].
[31] *Methadone*, World Health Org. (last visited Mar. 1, 2026), https://list.essentialmeds.org/medicines/18 [https://perma.cc/UP7G-YKUF].
[32] White House Off. of Nat'l Drug Control Pol'y, *National Drug Control Strategy* 8 (Apr. 2022), https://bidenwhitehouse.archives.gov/wp-content/uploads/2022/04/National-Drug-Control-2022Strategy.pdf [https://perma.cc/MFY9-ZFNH].
[33] White House Off. of Nat'l Drug Control Pol'y, *Statement of Drug Policy Priorities*, 4 (Apr. 1, 2025), https://www.whitehouse.gov/wp-content/uploads/2025/04/2025-Trump-Administration-Drug-Policy-Priorities.pdf [https://perma.cc/26FB-85DA].
[34] Fox Nashville, *RFK Jr. in Nashville for 2025 Rx and Illicit Drug Summit*, YouTube (Apr. 24, 2025), https://www.youtube.com/watch?v=1Ap9E0iIc7Q [https://perma.cc/235A-CTNQ].
[35] *A Helping Hand, LLC v. Balt. Cnty.*, Md., 515 F.3d 356, 367 (4th Cir. 2008).

70)     This stigma is grounded in longstanding, widespread, and deeply rooted misconceptions that OUD is a choice and a moral failing, rather than a disease of the brain.

71)     These misconceptions persist even though OUD is a condition that rewires the brain—a condition that millions of Americans of all backgrounds live with. As National Institute on Drug Abuse Director Dr. Nora D. Volkow wrote, stigma "is especially powerful in the context of substance use disorders. Even though medicine long ago reached the consensus that addiction is a complex brain disorder, those with addiction continue to be blamed for their condition."[36] A study led by a West Virginia University professor found that stigma was a barrier to engaging in MOUD treatment for West Virginians.[37]

72)     Some people, for example, continue to inaccurately regard MOUD as merely substituting one drug for another—conflating the professional administration of a World Health Organization essential medicine with the unregulated use of illicit drugs. Instead, as described above, MOUD is proven to save lives and improve quality of life.

73)     West Virginia's moratorium and zoning restrictions are rooted in this stigma. For example, during the West Virginia House of Delegates debate of a bill that would have lifted the moratorium, Delegate Ty Nestor from Randolph said of methadone: "This stuff

---

[36] Nora D. Volkow, *Fighting Back Against the Stigma of Addiction*, Sci. Am. (Sep. 1, 2020), https://www.scientificamerican.com/article/fighting-back-against-the-stigma-of-addiction/ [https://perma.cc/343R-L252].

[37] Adam D. Baus, et al., *A Better Life: Factors that Help and Hinder Entry and Retention in MAT from the Perspective of People in Recovery*, 5 J. Appalachian Health 74, 90 (2023), https://uknowledge.uky.edu/cgi/viewcontent.cgi?article=1198&context=jah [https://perma.cc/4LSD-AAVY].

is bad. You can't fight West Virginia's addiction to opioids with something just like heroin and just calling it something different."[38]

74) The state of West Virginia itself acknowledges that stigma against people with substance use disorder is a problem. Indeed, the state's Office of Drug Control Policy sponsors stigma awareness trainings.[39]

**VII. West Virginia institutes a moratorium on new methadone clinics and zoning restriction on treatment programs.**

75) In 2007, the West Virginia legislature singled out OTPs for uniquely harsh regulation, by instituting a blanket moratorium on all new OTPs statewide. While other health facilities in West Virginia may open, so long as they comply with relevant local, state, and federal law, no OTP may open pursuant to the moratorium.

76) Prior to the moratorium, OTPs, too, could open, so long as they complied with relevant local, state, and federal regulations. At that time, West Virginia required OTPs—and many other health facilities—to obtain a certificate of need from the West Virginia Health Care Authority in order to be licensed by the state. But the West Virginia legislature imposed the moratorium, by prohibiting licensing of any new OTPs that lacked a certificate of need, while also prohibiting the Health Care Authority from issuing a certificate of need to any new OTPs.[40]

---

[38] Steven A. Adams, *House Passes Two Certificate of Need Exemption Bills*, The Weirton Daily Times (Feb. 24, 2022), https://www.weirtondailytimes.com/news/local-news/2022/02/house-passes-two-certificate-of-need-exemption-bills/ [https://perma.cc/B5TZ-XRDJ].
[39] W. Va. Dep't of Human Servs., Facebook (Nov. 27, 2025), https://www.facebook.com/wv.dohs/posts/invest-in-your-teams-knowledge-the-office-of-drug-control-policy-odcp-delivers-e/122234582018157267/ [https://perma.cc/977C-QP2D].
[40] The relevant West Virginia statute reads:

> There is a moratorium on the licensure of new opioid treatment programs which do not have a certificate of need as of the effective date of the enactment of this

77)     The state's OTP moratorium has artificially frozen in place the methadone treatment landscape for over fifteen years, despite the dramatic changes to the drug supply and the increase in need for methadone during that time. While the number of OTPs nationwide has nearly doubled in the past fifteen years—from 1,189 methadone clinics in 2011[41] to over 2,100 in 2026[42]—in West Virginia, the same nine clinics have been operating for over fifteen years.

78)     As shown in the figure below, these clinics are in nine different municipalities across the state: Beaver, Charleston, Clarksburg, Huntington, Martinsburg, Morgantown, Parkersburg, Triadelphia, and Williamson.[43]

---

section during the 2016 regular session of the Legislature which shall continue until the Legislature determines that there is a necessity for additional opioid treatment programs in West Virginia.

W. Va. Code § 16B-13-12. The West Virginia Health Care Authority is prohibited from issuing a certificate of need to an OTP. W. Va. Code § 16-2D-9(4).

[41] Substance Abuse and Mental Health Servs. Admin., *The N-SSATS Report: Trends in the Use of Methadone and Buprenorphine at Substance Abuse Treatment Facilities: 2003 to 2011* 2 (Apr. 23, 2013), https://www.samhsa.gov/data/sites/default/files/N-SSATS%20Rprt%20Trnds%20Use%20Methadone%20&%20Buprenorphine%20at%20SA%20Trmt%20Facs%20%2003-11/N-SSATS%20Rprt%20Trnds%20Use%20Methadone%20&%20Buprenorphine%20at%20SA%20Trmt%20Facs%20%2003-11/sr107-NSSATS-Buprenorph.pdf [https://perma.cc/CX4G-MNAQ].

[42] *Opioid Treatment Program Directory*, Substance Abuse and Mental Health Servs. Admin. (last visited March 1, 2026), https://www.samhsa.gov/find-help/locators/opioid-treatment-program-directory [https://perma.cc/H2NJ-GRYE].

[43] W. Va. Dep't of Health and Hum. Res., *Medicaid 101 Substance Use Disorder Waiver* 16 (2020), https://bms.wv.gov/media/30401/download?inline [https://perma.cc/L2G4-4PUK].

22

**Figure 12:  Methadone Medication-Assisted Treatment (MAT) Recipients by County of Residence (January 2018 – June 2019)**



• *Denotes the location of the state's 9 approved OTP facilities*

79)     West Virginia has a great need for methadone access: in 2024, some 45,000 people had an opioid use disorder.[44] But, as of the most recent data available from 2019, only 2,123 West Virginians with OUD were receiving treatment with methadone.[45] On information and belief, West Virginia still lags behind the nation overall in access to methadone treatment.

---

[44] Substance Abuse and Mental Health Servs. Admin., *2023-2024 National Surveys on Drug Use and Health: Model-Based Estimated Totals (in Thousands) (50 States and the District of Columbia)* 58 (2025), https://www.samhsa.gov/data/sites/default/files/reports/rpt56987/2024-nsduh-sae-totals-tables-csvs/2024-nsduh-sae-totals-tables.pdf [https://perma.cc/K2QN-ZHR9].
[45] W. Va. Dep't of Health and Hum. Res., *supra* note 43, at 14.

80)     The long distance between OTPs is especially burdensome for new OTP patients, who are often required to come to the OTP frequently to receive their medication in the first months of treatment. Many find it impossible to maintain a job and support a family, while also traveling hours each day to receive methadone.

81)     Large swaths of the state are not serviced by an OTP at all, making access to methadone virtually impossible. Someone in Durbin, for example, would have to travel roughly two hours to get to the closest OTP in West Virginia, which is in Clarksburg. The burden of travel to OTPs is greater for rural residents of West Virginia than it is for those in more urban areas.[46]

82)     Even for those who live close to one of the nine OTPs in West Virginia, it is often difficult to receive methadone. When the hours of operation of the only OTP in their area do not work for a patient's schedule, patients will sometimes miss appointments and thereafter be refused care at the OTP. Frequently, dosing appointments are very early in the morning and far away by foot or bike, and inaccessible—or virtually inaccessible— by public transportation. This presents barriers for many patients at OTPs, but especially patients with mobility disabilities and those who lack their own cars. Additionally, some patients have reported that they had a conflict with another patient at the only OTP in their area; were terminated from treatment at the OTP; and then had no other place to go to receive methadone. Without the moratorium, there would be more than one OTP in communities across West Virginia, and patients would have more options to continue receiving their methadone.

---

[46] Lindsay Allen, et al., *Drive Times to Methadone Treatment Among Medicaid Patients*, 33(3) J. Health Care Poor Underserved 1169 (2022), https://pubmed.ncbi.nlm.nih.gov/36245155/ [https://perma.cc/75RG-GLAD].

83)    Seven of the nine clinics are owned by Acadia Healthcare, a for-profit company that has come under scrutiny from federal prosecutors in West Virginia for allegedly overbilling Medicaid for blood and urine tests, resolving these claims for $17 million without admitting wrongdoing. Yet, because of the moratorium, no new clinics can compete with these seven Acadia-owned clinics. Acadia describes their investment in OTPs as "a business we continue to feel great about."[47]

84)    No city or county has more than one OTP, so there is no local competition between OTPs. If there were more than one OTP in a city or county, patients would have a choice about which facility to go to—and would face lower barriers to receiving care for their OUD. As it stands now, if the hours of operation of the one clinic in their area do not work for their schedule, patients cannot receive methadone in their area at all.

85)    On top of this outright ban on new OTPs, West Virginia also added a zoning requirement that prohibits new "medication-assisted treatment programs" from locating "within one-half mile of a public or private licensed day care center or public or private K-12 school." Existing OTPs and other treatment programs may continue to operate in their current location so long as they "demonstrate[] adequate patient population controls" and comply with existing state law. W. Va. Code § 16B-13-6(c).

86)    This means that even if the moratorium were lifted, new OTPs—as medication-assisted treatment programs—would have to comply with the discriminatory zoning requirement

---

[47] Katie Thomas and Jessica Silver-Greenberg, *Fraud and Fakery at the Country's Largest Chain of Methadone Clinics*, N.Y. Times (Dec. 7, 2024), https://www.nytimes.com/2024/12/07/health/acadia-methadone-clinics-fraud.html [https://perma.cc/DW3L-X4JH].

in determining location. This limitation on where a facility may be located does not apply to other types of health care facilities.

87) If the moratorium and zoning restrictions were lifted, more OTPs would open across the state of West Virginia, and OTPs would have an easier time finding appropriate locations to operate.

### VIII. West Virginia's restrictions on access to methadone frustrate SOAR-WV's mission and divert resources from its core business activities.

88) SOAR-WV's mission and core business activities—to save lives, reduce harm and stigma, and empower individuals impacted by drug use through harm reduction, advocacy, and access to life-saving resources—are frustrated by the methadone moratorium, which prohibits new clinics that offer a medication that is essential for the health of individuals who are impacted by drug use. Even without the moratorium, the zoning restriction would also frustrate SOAR-WV's mission and core business activities, because it limits the potential locations for new clinics.

89) SOAR-WV is injured by the moratorium and zoning restrictions in two primary ways.

90) First, the moratorium and zoning restrictions limit SOAR-WV's ability to refer the individuals it serves to effective treatment options, forcing them to expend resources providing services to individuals who would otherwise be receiving effective treatment and not in need of SOAR-WV's services. For instance, as the moratorium precludes a second clinic from opening in Charleston, individuals who can no longer receive care at the only clinic in Charleston—for reasons that include missing appointments due to scheduling conflicts during the short window the clinic is open in the morning, or not being able to access the clinic because it is too far away—have no other local option to receive methadone. SOAR-WV is, in turn, forced to expend resources working with these

26

individuals who—because of the moratorium—have no realistic choice but to transition from methadone to a less effective treatment alternative.

91) Second, SOAR-WV is forced to expend more resources in its statewide naloxone distribution efforts and is further from achieving its core organizational mission of saturating the state in naloxone because there is a larger pool of individuals who are at risk of overdose because of the moratorium and zoning restrictions. SOAR-WV's work and the injuries caused by the moratorium and zoning restriction are further described in the paragraphs that follow.

92) SOAR-WV analogizes its work to a river: upstream is prevention (helping people avoid utilizing illicit drugs in the first place); downstream from prevention is harm reduction (helping to prevent the needless death of people who engage in drug use by providing naloxone, fentanyl test strips, etc.); further downstream is treatment (connecting people who use drugs with evidence-based treatment and support, based on their goals for health and stability); and finally, all the way downstream is re-entry/recovery (helping people thrive by supporting their goals for health, stability, and connection).

93) SOAR-WV knows that if they miss people at any point in this river, there is a chance they won't make it to the next point along the river to receive services. SOAR-WV's leadership knows this personally: they have been to too many funerals for friends and people who have participated in SOAR-WV's programs who have needlessly died of an overdose. Their goal is to not have to go to any more of these funerals.

94) To work towards its goal, SOAR-WV engages in four main activities: 1) a monthly mutual aid event in Charleston that connects people with OUD and other needs to medical and social services and supports, including harm reduction and treatment

services; 2) an annual naloxone[48] distribution day known as "Save a Life Day," led by SOAR-WV volunteers in all 55 West Virginia counties; 3) a regular syringe and litter pickup in Charleston; and 4) leveraging the relationships of trust they have built to connect otherwise difficult-to-reach individuals with OUD to addiction services and support year-round.

95)    The monthly mutual aid event includes a homemade meal, and it provides connection to peer recovery coaches, drug treatment (including MOUD providers), naloxone, drug testing strips that detect and warn individuals if fentanyl or other contaminants are in their drugs, wound care, vaccines, a sewing table to mend clothing, job opportunities, hygiene products, and on-site childcare. Seasonally, these fairs have also included bicycle repair, haircuts, public defenders and legal aid services, make-your-own clay-based portable heaters, and art-making stations such as water coloring.

96)    For Save a Life Day, SOAR-WV recruits volunteers and partners in all 55 counties to distribute naloxone strategically in areas with a high concentration of overdoses. SOAR-WV encourages the volunteers to work with peer recovery coaches as they distribute naloxone, so volunteers are better able to refer individuals to treatment. In addition to recruiting volunteers, SOAR-WV hosts monthly planning calls with county leaders for Save a Life Day, builds morale, and oversees naloxone distribution across the state. Along with organizing in-person naloxone distribution, SOAR-WV ships at least five emergency naloxone wall boxes to every county in the state as part of Save a Life Day. These boxes are each permanently mounted on a wall, and SOAR-WV expects volunteers

---

[48] Naloxone is an opioid overdose reversal medication, which has saved thousands of lives throughout the country, including in West Virginia.

28

to monitor the boxes year-round to ensure timely refills, for easy access to naloxone in the community. Additionally, SOAR-WV has distributed twelve permanent metal naloxone dispensers throughout the state, which are often placed outdoors for 24/7 availability, and works with volunteers to ensure that the boxes remain filled with naloxone.

97)    At the 2025 Save a Life Day, for example, the Raleigh County team distributed naloxone from eight different sites, and they connected one person they encountered to treatment that same day.

98)    SOAR-WV's goal is to "saturate" the state with naloxone so that no one who uses drugs ever has to needlessly die of an overdose. Yet today, they are still far from that goal—as West Virginia continues to lead the nation in the rate of overdose deaths. Easy access to naloxone can be the difference between life and death: increased naloxone distribution decreases overdose deaths.[49]

99)    SOAR-WV's quarterly syringe and litter clean up brings 30 to 50 people—many of whom have a substance use disorder, or are in recovery from a substance use disorder— to clean the streets of Charleston. SOAR-WV offers a $20 stipend to attendees for a 90-minute shift, along with snacks, water, trash pickers, and trash bags. Here, too, SOAR-WV distributes naloxone to participants of the syringe and litter clean up. Additionally, SOAR-WV has a 24/7 syringe litter hotline that allows community members to report syringe litter, and SOAR-WV will deploy a volunteer to clean up the litter.

---

[49] Leah S. Fischer, et al., *Effectiveness of naloxone distribution in community settings to reduce opioid overdose deaths among people who use drugs: a systematic review and meta-analysis*, 25 BMC Pub. Health 1135 (2025), https://pmc.ncbi.nlm.nih.gov/articles/PMC11934755/ [https://perma.cc/3DNL-NYAR].

100) Together, these programs help SOAR-WV's staff and volunteers build trusting relationships with many people in Charleston and around the state who have OUD. SOAR-WV's deep relationships with people with active substance use disorders also make the organization a key information source for other care providers in the community. SOAR-WV is often the first to alert others about a bad batch of drugs in the Charleston area—with deadly adulterants—that is causing a spike in drug overdoses. Getting this information to other service providers helps reduce the risk of overdose death for SOAR-WV's participants and others.

101) SOAR-WV also refers individuals to treatment, by coordinating with peer recovery coaches, and by contacting treatment programs with whom they have ongoing relationships about openings to get individuals into treatment—including OTPs.

102) SOAR-WV works with individuals who have been excluded from Charleston's only OTP and thus lack access to methadone. The nearest OTP outside of Charleston is 45 minutes away, making daily trips to the next closest OTP nearly impossible for many people with other work and family responsibilities, or who have transportation limitations. When necessary, SOAR-WV helps individuals go through the arduous—and sometimes unsuccessful—process of transitioning from methadone to another treatment modality, which then may or may not work for them, or off of treatment altogether.

103) SOAR-WV has done this work for years, and plans to continue doing this work for years to come.

104) If the OTP moratorium and zoning restrictions were lifted, numerous clinics would open across the state, including in Charleston. More West Virginians would be able to receive methadone. There would thus be more people in treatment and fewer people in need of

naloxone and connection with treatment and other social services, and SOAR-WV's operations would change in several ways.

105) Starting any form of MOUD requires a sometimes challenging medical transition, and there is a danger that someone who is unsuccessful on methadone will not be able to navigate a second transition to buprenorphine and will instead return to using opioids. For that reason, if SOAR-WV is concerned an individual will not be able to receive treatment successfully at Charleston's one OTP due to its hours, policies, location, or other issues, SOAR-WV sometimes connects that person with buprenorphine rather than with the OTP for methadone. For some individuals, buprenorphine is less effective than methadone in treating their OUD. The presence of just one OTP in Charleston due to the moratorium thus harms SOAR-WV by 1) taking their time and resources to evaluate whether someone is able to receive care effectively from the single OTP, and 2) frustrating their mission to connect individuals with effective medical treatment to address OUD and avoid needless overdoses.

106) An additional clinic or clinics in Charleston would mean that SOAR-WV could refer people who are no longer eligible to receive services at one OTP, or for whom the hours or requirements of that OTP are inaccessible, to another local OTP. This is more effective than SOAR-WV's current practice of referring individuals in that position to other, often less effective services. An additional clinic would also require SOAR-WV to expend fewer resources. Today, SOAR-WV must spend significant time and resources, over an extended period, to support a person going through the painful and life-threatening transition from an effective MOUD to a new treatment modality or off of treatment altogether, with the attendant increased risks of relapse, overdose, and death. If there

were another OTP in Charleston, SOAR-WV could, with far fewer resources, simply refer individuals to another OTP to continue receiving a treatment that has proven to be effective for them.

107) Additionally, if new clinics opened across the state, more individuals would start methadone treatment and achieve recovery. People who receive MOUD are more likely to be housed, employed, and stable than those who are actively using illicit opioids, and thus less likely to need services and supports from SOAR-WV. SOAR-WV could then focus its limited resources on a smaller pool of individuals who are not yet in treatment, in order to connect them with services and care. But today, SOAR-WV supports individuals across the state who want access to methadone, but need more support from SOAR-WV because they cannot receive it.

108) With more methadone clinics and more people in recovery, fewer people would be at risk of overdose. With fewer people in need of overdose reversal medications, SOAR-WV would thus get closer to achieving their goal of "saturating" West Virginia in naloxone. Instead, with more people in need of recovery services, SOAR-WV has to spread its resources more thinly across the state. This perceptibly impairs SOAR-WV's mission "to save lives, reduce harm and stigma, and empower individuals impacted by drug use through harm reduction, advocacy, and access to life-saving resources—helping build a community rooted in care and dignity for all."

**CLAIMS FOR RELIEF**

**First Claim**
**Violation of Title II of the Americans with Disabilities Act,**
**42 U.S.C. §§ 12131, et seq.**

109)    The allegations of Paragraphs 1 to 108 of this Complaint are hereby realleged and incorporated by reference.

110)    Title II of the Americans with Disabilities Act ("ADA") prohibits state and local government entities from denying qualified individuals with disabilities an equal opportunity to benefit from the entity's services, programs, or activities. 42 U.S.C. § 12132. The ADA's protections extend to all aspects of a public entity's activities, including the provision of licensing and zoning of medical facilities.

111)    The ADA provides that public entities may not provide aids, benefits, or services in such a way that qualified individuals are denied opportunities to participate or benefit, 28 C.F.R. § 35.130(b)(1); may not rely on "methods of administration that . . . defeat[] or substantially impair[] accomplishment" of the program's objectives, 28 C.F.R. § 35.130(b)(3)(ii); and may not provide "aids, benefits, or services" in such a way that qualified individuals are not afforded "equal opportunity to obtain the same result . . . as that provided to others," or are "otherwise limit[ed] . . . in the enjoyment of any right, privilege, advantage, or opportunity enjoyed by others receiving the aid, benefit, or service," 28 C.F.R. § 35.130(b)(1). Public entities "shall make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability." 28 C.F.R. § 35.130(b)(7).

112)    The State of West Virginia is a public entity as defined by Title II of the ADA. 42 U.S.C. § 12131(1). West Virginia's licensing of methadone clinics, issuance of certificates of need, and zoning are services, programs, or activities within the meaning of Title II.

113)    West Virginians with OUD who want to access services at an OTP are people with disabilities within the meaning of the ADA. They are otherwise qualified to participate in and benefit from the state's licensing and zoning of health facilities.

114)    West Virginia's moratorium on OTPs and zoning restriction discriminates against people with disabilities by regulating OTPs more strictly than health facilities that treat nondisabled people and people with other disabilities, and deny West Virginians with OUD an equal opportunity to benefit from West Virginia's licensing and zoning of health facilities. West Virginia has also failed to reasonably accommodate individuals with opioid use disorder in enforcement of its licensing and zoning statutes and regulations, and used methods of administration that impair accomplishment of the objectives of the state's program of licensing and zoning of health facilities.

115)    The moratorium and zoning restrictions placed on OTPs are causing ongoing injury to SOAR-WV's mission by requiring it to divert its resources to counteract the harm caused by the moratorium, draining SOAR-WV of limited resources and keeping it further away from its goal of saturating the state in naloxone and reducing overdose deaths.

**Second Claim**
**Violation of Section 504 of the Rehabilitation Act,**
**29 U.S.C. § 794**

116)    The allegations of Paragraphs 1 to 108 of this Complaint are hereby realleged and incorporated by reference.

117) Section 504 prohibits discrimination against people with disabilities by any program or activity receiving federal financial assistance. Under Section 504, otherwise qualified individuals with disabilities may not be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any such program. 29 U.S.C. § 794(a). A program or activity includes "all of the operations of a department, agency, special purpose district, or other instrumentality of a State or of a local government." 29 U.S.C. § 794(b)(1).

118) West Virginia receives "federal financial assistance" within the meaning of 29 U.S.C. § 794(a). For example, West Virginia receives federal funding to support opioid response.[50]

119) West Virginia's licensing of OTPs, issuance of certificates of need, and enactment of zoning restrictions are "program[s] or activit[ies]" within the meaning of 29 U.S.C. § 794(b)(l)(A)–(B).

120) Section 504 provides that covered entities may not provide aids, benefits, or services in such a way that qualified individuals are denied opportunities to participate or benefit, 45 C.F.R. § 84.68(b)(1)(i); may not "utilize . . . methods of administration . . . [t]hat defeat[] or substantially impair[] accomplishment" of the program's objectives, 45 C.F.R. § 84.68(b)(3)(ii); and may not "provid[e] any aid, benefit, or service" in such a way that qualified individuals are not afforded "equal opportunity to obtain the same result. . . as that provided to others," or are "[o]therwise limit[ed] . . . in the enjoyment of any right, privilege, advantage, or opportunity enjoyed by others receiving the aid, benefit, or service." 45 C.F.R. § 84.68(b)(1). Covered entities "shall make reasonable modifications

---

[50] West Virginia receives federal State Opioid Response (SOR) funds. *State Opioid Response*, W. Va. Dep't of Hum. Servs. (last visited Mar. 1, 2026), https://bbh.wv.gov/state-opioid-response-sor [https://perma.cc/VA8W-E4EF].

in policies, practices, or procedures when such modifications are necessary to avoid discrimination on the basis of disability." 45 C.F.R. § 84.68(b)(7).

121) West Virginians with OUD are people with disabilities within the meaning of the Rehabilitation Act. They are otherwise qualified to participate in and benefit from the state's licensing and zoning of health facilities.

122) West Virginia's moratorium on OTPs and zoning restrictions discriminates against people with disabilities by regulating OTPs more strictly than health facilities that treat people with other disabilities. This denies West Virginians with OUD an equal opportunity to benefit from West Virginia's licensing and zoning of health facilities. West Virginia has also failed to reasonably accommodate individuals with opioid use disorder in enforcement of its zoning and licensing statutes and regulations, and used methods of administration that impair accomplishment of the objectives of the state's program of licensing and zoning of health facilities.

123) The moratorium and zoning restrictions placed on OTPs are causing ongoing injury to SOAR-WV's mission by requiring it to divert its resources to counteract the harm caused by the moratorium, draining SOAR-WV of limited resources and keeping it further away from its goal of saturating the state in naloxone and reducing overdose deaths.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiff requests that the Court:

    a.  Assume jurisdiction over this action;

    b.  Declare that Defendants' conduct as alleged in the Complaint violates Plaintiff's rights under:

        i.  Title II of the ADA;

36

ii. Section 504 of the Rehabilitation Act;

c. Enjoin Defendants from:

i. Enforcing the methadone moratorium; and

ii. Enforcing the zoning restriction against OTPs;

d. Award Plaintiff his reasonable attorney's fees and costs; and

e. Grant any further relief that the Court may deem just and proper.

Dated: March 5, 2026
Charleston, West Virginia

Respectfully submitted,
/s/ Aubrey Sparks
Aubrey Sparks (WV Bar No. 13469)
asparks@acluwv.org
ACLU WEST VIRGINIA
606 Virginia St. E
Charleston, WV 25301
(304) 202-3435

Joseph Longley* (MD Bar No. 1912180019)
JLongley1@aclu.org
Sarah Steege* (MD Bar No. 1306190292)
SSteege@aclu.org
AMERICAN CIVIL LIBERTIES UNION
915 15th St. NW, Seventh Floor
Washington, D.C. 20005

Zoe Brennan-Krohn* (CA Bar No. 324912)
ZBrennan-Krohn@aclu.org
AMERICAN CIVIL LIBERIES UNION
425 California St., Seventh Floor
San Francisco, CA 94104

David Howard Sinkman* (NY Bar No. 4684981)
sinkman@kaplangrady.com

37

Matthew Underwood* (MA Bar No. 684609; DC Bar No. 1030122)
matthew@kaplangrady.com
Amelia Caramadre* (MA Bar No. 710230)
amelia@kaplangrady.com
KAPLAN & GRADY LLC
2071 N. Southport Ave., Ste. 205
Chicago, IL 60614

*Statement of Visiting Attorney forthcoming*