UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF WEST VIRGINIA
HUNTINGTON DIVISION

| | |
|---|---|
| SOLUTIONS ORIENTED ADDICTION RESPONSE WEST VIRGINIA<br>    *Plaintiff*,<br>     v.<br><br>STATE OF WEST VIRGINIA, *et al.*<br>     *Defendants*. | Case No. 3:26-cv-00175 |

## MEMORANDUM IN OPPOSITION TO THE MOTION TO DISMISS

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES..................................................................................................ii

INTRODUCTION ............................................................................................................. 1

I.    Factual Background ................................................................................................. 1

II.    SOAR-WV Has Organizational Standing Because It Has Adequately Pled That Defendants' Violation of Disability Laws Causes It Direct Harm ..................................................... 6

    A.    SOAR-WV Plausibly Alleges That It Suffers an Injury-In-Fact as a Result of the Methadone Moratorium and Zoning Restrictions...................................................... 7

    B.    SOAR-WV Plausibly Alleges Its Injuries Were Caused by and Traceable to the Moratorium and Zoning Restrictions.................................................................... 12

    C.    SOAR-WV Plausibly Alleges Its Injuries Would Be Redressed by a Favorable Ruling Invalidating the Moratorium and Zoning Restrictions............................................. 15

CONCLUSION................................................................................................................ 19

## TABLE OF AUTHORITIES

**Cases**

*A Helping Hand, LLC v. Baltimore Cnty., MD,*
515 F.3d 356 (4th Cir. 2008) ........................................................................................ 6

*Air Evac EMS, Inc. v. Cheatham,*
910 F.3d 751 (4th Cir. 2018) .................................................................................... 12, 13

*Atl. States Legal Found. v. Al Tech Specialty Steel Corp.,*
635 F. Supp. 284 (N.D.N.Y. 1986) .............................................................................. 14

*Bay Area Addiction Rsch. & Treatment, Inc. v. City of Antioch,*
179 F.3d 725 (9th Cir. 1999) ......................................................................................... 2

*Bostic v. Schaefer,*
760 F.3d 352 (4th Cir. 2014) ....................................................................................... 14

*Colo. River Water Conservation Dist. v. United States,*
424 U.S. 800 (1976) ...................................................................................................... 6

*Cottrell v. Alcon Labs.,*
874 F.3d 154 (3d Cir. 2017) .......................................................................................... 8

*D.C. by Chaplick v. Fairfax Cnty. Sch. Bd.,*
171 F.4th 255 (4th Cir. 2026) ..................................................................................10, 11

*Deal v. Mercer Cnty. Bd. of Educ.,*
911 F.3d 183 (4th Cir. 2018) ....................................................................................... 15

*Diamond Alternative Energy, LLC v. E.P.A.,*
606 U.S. 100 (2025) .......................................................................................... 16, 17, 19

*Fair Emp. Council of Greater Washington, Inc. v. BMC Mktg. Corp.,*
28 F.3d 1268 (D.C. Cir. 1994) ..................................................................................... 12

*Food & Drug Admin. v. All. for Hippocratic Med.,*
602 U.S. 367 (2024) .............................................................................................. *passim*

*Frame v. City of Arlington,*
657 F.3d 215 (5th Cir. 2011) ....................................................................................11, 13

*GenBioPro, Inc. v. Sorsaia,*
No. 3:23-0058, 2023 WL 3211847 (S.D. W. Va. May 2, 2023) ............................... 8, 17

*Harper v. Va. State Bd. of Elections,*
383 U.S. 663 (1966) ...................................................................................................... 8

*Havens Realty Corp. v. Coleman,*
455 U.S. 363 (1982) ...................................................................................................... 8

*Innovative Health Sys., Inc. v. City of White Plains,*
117 F.3d 37 (2d Cir. 1997) ............................................................................................ 2

*Kerns v. United States,*
585 F.3d 187 (4th Cir. 2009) ................................................................................. *passim*

*Lansdowne on the Potomac Homeowners Ass'n, Inc. v. OpenBand at Lansdowne, LLC,*

713 F.3d 187 (4th Cir. 2013)...................................................................................... 18

*Lujan v. Defs. of Wildlife*,
   504 U.S. 555 (1992)............................................................................................. 7, 12

*Massachusetts v. E.P.A.*,
   549 U.S. 497 (2007)........................................................................................... 15, 18

*MX Grp., Inc. v. City of Covington*,
   293 F.3d 326 (6th Cir. 2002)................................................................................ 2, 6

*National Treasury Employees Union v. United States*,
   101 F.3d 1423 (D.C. Cir. 1996)..............................................................................11

*New Directions Treatment Servs. v. City of Reading*,
   490 F.3d 293 (3d Cir. 2007) ..................................................................................... 2

*People for Ethical Treatment of Animals, Inc. v. Tri-State Zoological Park of W. Md., Inc.*,
   843 F. App'x 493 (4th Cir. 2021) .......................................................................... 7, 9

*Republican Nat'l Comm. v. N. Carolina State Bd. of Elections*,
   120 F.4th 390 (4th Cir. 2024)...................................................................... 6, 7, 8, 9

*S.C. Elec. & Gas Co. v. Randall*,
   331 F. Supp. 3d 485 (D. S.C. 2018)....................................................................... 14

*Sierra Club v. United States Dep't of the Interior*,
   899 F.3d 260 (4th Cir. 2018)...................................................................... 15, 17, 18

*Trump v. CASA, Inc.*,
   606 U.S. 831 (2025)............................................................................................... 16

*United States v. Students Challenging Regul. Agency Procs. (SCRAP)*,
   412 U.S. 669 (1973)................................................................................................. 8

**Statutes**

21 C.F.R. § 1306.04(c)............................................................................................... 1
42 C.F.R. § 8 ............................................................................................................. 1

**Rules**

Fed. R. Civ. P. 12(b)(1) ............................................................................................. 2

**INTRODUCTION**

Solutions Oriented Addiction Response West Virginia's ("SOAR-WV" or "Plaintiff")

Complaint, Dkt. No. 1, alleges that West Virginia's methadone moratorium and zoning

restrictions discriminate against people with disabilities by regulating opioid treatment programs

("OTPs")[1] more strictly than health facilities that serve nondisabled people and people with other

disabilities. SOAR-WV alleges that this differential treatment denies West Virginians with opioid

use disorder ("OUD") an equal opportunity to benefit from the state's licensing and zoning of

health facilities, in violation of Title II of the Americans with Disabilities Act ("ADA") and

Section 504 of the Rehabilitation Act ("Section 504"). Defendants' Motion to Dismiss for lack of

standing under Rule 12(b)(1) ("Motion to Dismiss"), Dkt. No. 26, is without merit. This Court

has jurisdiction because SOAR-WV, the state's largest overdose prevention group, has alleged an

injury-in-fact to its operation of drug treatment referral services and other services that are core

to fulfilling its mission. These injuries are caused by and traceable to the moratorium and zoning

restrictions that have prevented any new OTPs from opening in West Virgina over the last fifteen

years. These injuries are redressable through injunctive and declaratory relief invalidating the

moratorium and zoning restrictions. Accordingly, Defendants' Motion to Dismiss should be

denied.

## I. Factual Background

The following facts are from the Complaint and must be presumed true for purposes of

resolving this motion to dismiss. *Kerns v. United States*, 585 F.3d 187, 192 (4th Cir. 2009).[2]

---

[1] OTPs are the only entities federally authorized to dispense methadone for opioid use disorder. 42 C.F.R. § 8; 21 C.F.R. § 1306.04(c).

[2] While Defendants move to dismiss under Fed. R. Civ. P. 12(b)(1), they do not specify if they are making a facial or factual challenge to Plaintiff's standing. Given that they do not dispute the truth of any factual contention, Plaintiff reads the Motion to Dismiss as a facial challenge, whereby the court assumes "the facts alleged in the complaint are taken as true, and the motion

In 2007, West Virginia enacted a moratorium on new OTPs, artificially freezing West Virginia's methadone treatment landscape in place. Despite the dramatic change in the drug supply over that period that has led to an increased need for methadone to treat OUD, the moratorium has prohibited providers in West Virginia from meeting this increased need. Instead, the same nine—and only nine—clinics have operated in West Virginia. Compl. ¶¶ 44–49, 75–78. In addition to the outright prohibition on opening new OTPs, West Virginia also prohibits new treatment facilities from locating "within one-half mile of a public or private licensed day care center or public or private K-12 school." *Id*. ¶ 85. Together, these statutes single out OTPs for uniquely harsh regulation and have choked off meaningful access to essential medical care for individuals with OUD, especially those for whom methadone is the only effective medication for this condition. *Id*. ¶¶ 53, 79–82. At least four Circuits have found far less restrictive methadone regulations can violate federal disability law.[3]

OUD is a chronic, progressive disease of the brain, characterized by unsuccessful efforts to cut down on opioid use, cravings for opioids, and continued opioid use despite negative

---

must be denied if the complaint alleges sufficient facts to invoke subject matter jurisdiction." *Kerns*, 585 F.3d at 192. If the Court construes Defendants' motion as a factual challenge to standing, Plaintiff requests leave to develop the record on standing.

[3] *New Directions Treatment Servs. v. City of Reading*, 490 F.3d 293, 304–05 (3d Cir. 2007) (reversing summary judgment for city and holding that a state statute that bans methadone clinics within 500 feet of schools, churches, residential housing, and other structures facially violates the ADA); *MX Grp., Inc. v. City of Covington*, 293 F.3d 326, 330–31, 342 (6th Cir. 2002) (affirming a post-trial district court order that found a city's revocation of plaintiff methadone clinic's zoning permit and amendment of zoning code that precluded plaintiff from operating in the city violated the ADA); *Bay Area Addiction Rsch. & Treatment, Inc. v. City of Antioch*, 179 F.3d 725, 727–28 (9th Cir. 1999) (holding that an ordinance prohibiting operation of methadone clinics within 500 feet of residential areas can violate the ADA); *see also Innovative Health Sys., Inc. v. City of White Plains*, 117 F.3d 37, 42, 49 (2d Cir. 1997) (affirming a district court preliminary injunction, where city revoked drug treatment facility's permit for stigma-motivated reasons in violation of the ADA).

consequences to one's life, among other symptoms. *Id*. ¶ 34. This disease rewires the brain and often leads to the use of more powerful opioids to stave off painful withdrawal symptoms. *Id*. ¶ 35. OUD has caused an epidemic of overdose deaths in West Virginia and across the country. *Id*. ¶¶ 39–43. West Virginia has led the nation in the per-capita rate of opioid overdose deaths in fourteen of the last fifteen years, claiming the lives of nearly 12,000 West Virginians since 2008. *Id*. ¶¶ 39, 41. The rise of fentanyl—a powerful synthetic opioid—in the drug supply over the past decade has made OUD far more deadly. *Id*. ¶¶ 44–49.

While OUD is a deadly disease, there are effective, evidence-based medications available to treat it: medications for opioid use disorder ("MOUD"), including methadone. *Id*. ¶¶ 50–62. Each of the three FDA-approved MOUDs works differently and is medically necessary for different people based on differences in biology and other factors. *Id*. ¶¶ 51–57. Methadone is especially effective for those who frequently use fentanyl. *Id*. ¶¶ 52–53. For many West Virginians, methadone is the *only* effective medication to treat their OUD. *Id*. Methadone saves lives, reducing the risk of mortality for people with OUD by more than half. *Id*. ¶ 61. Methadone treatment is supported by a range of state and national organizations, including West Virginia's own current drug czar who "screamed [his] lungs out" that more methadone is needed in the state. *Id*. ¶¶ 64–68.

But because of the moratorium and zoning restrictions, many individuals with OUD are unable to access methadone. Based on the latest available data, only 2,123 of the 45,000 West Virginians with an OUD are treated with methadone—lagging behind national methadone treatment rates. *Id*. ¶ 79. The moratorium and zoning restrictions have resulted in large swaths of the state that lack any OTPs at all. *Id*. ¶ 81. And there is no municipality in West Virginia that has more than one OTP, leaving patients with no choice about which methadone clinic they go to,

3

and stifling any competition between OTPs. *Id*. ¶¶ 83–84. Indeed, seven of the state's nine methadone clinics are owned by the same company. *Id*. ¶ 83. Even in areas with an OTP, this scarcity leaves people who cannot access the only local OTP because of scheduling constraints or other barriers with no realistic option to receive methadone. *Id*. ¶ 82. The lack of reliable public transportation makes traveling to a clinic very difficult. *Id.* If the moratorium were lifted, new OTPs would open across West Virginia, including in Charleston. *Id*. ¶ 87. If the zoning restrictions were lifted as well, these new OTPs would more easily identify and secure appropriate locations to operate. *Id.*

SOAR-WV is a 501(c)(3) non-profit organization that works throughout all 55 West Virginia counties. Its core mission has been directly harmed by the moratorium and the zoning restrictions. *Id*. ¶¶ 12, 88. SOAR-WV's mission is to save lives, reduce harm and stigma, and empower individuals impacted by drug use through harm reduction, advocacy, and access to life-saving resources. *Id*. ¶ 88. SOAR-WV builds and maintains relationships with people who have OUD through its work, including a monthly mutual aid fair and a quarterly syringe and litter clean up, both of which take place in Charleston. *Id*. ¶¶ 94–103. By building these trusting relationships, SOAR-WV often refers the individuals it works with to treatment services both in Charleston and across the state, including OTPs when appropriate and available. *Id*. ¶¶ 97, 101. SOAR-WV also helps support individuals who, for a variety of reasons, no longer have access to the only OTP in Charleston. *Id*. ¶ 102. In addition, SOAR-WV distributes naloxone, the overdose reversal medication, in all 55 West Virginia counties, with the goal of "saturating" the state in naloxone so that no one dies of a preventable overdose. *Id*. ¶¶ 96–98.

But because of the moratorium and zoning restrictions, SOAR-WV is forced to expend additional resources because West Virginia is violating federal disability law and discriminating

against people with OUD. *Id*. ¶¶ 89–91, 104–108. Because of the illegal moratorium and zoning restrictions, and the resulting dearth of OTPs in the state, SOAR-WV is limited in the effective referrals it can make to treatment services—an activity central to its mission. *Id*. ¶¶ 105–106. The fact that there is at most one OTP in each jurisdiction makes SOAR-WV's referral of participants to an OTP riskier. If treatment at the sole local clinic proves inaccessible—whether because of operating hours, transportation barriers, or another clinic-specific reason—there is no other OTP in the area where a patient can receive methadone for their OUD. Since there is only one clinic in Charleston, for example, SOAR-WV is forced to expend additional resources supporting individuals going through the medically risky and painful withdrawal process of discontinuing methadone or transitioning to another MOUD—or to no treatment at all—because they can no longer access the only OTP in the jurisdiction. *Id*. ¶ 106. If there were no moratorium and zoning restrictions, there would likely be another clinic in Charleston from which these individuals could receive continued access to methadone, rather than undergo destabilizing treatment interruptions. *Id*. ¶ 104.

Additionally, the moratorium and zoning restrictions make SOAR-WV's ongoing statewide naloxone distribution activities and treatment referrals more costly and less effective, by expanding the number of individuals in need of these services. *Id*. ¶¶ 107–108. If there were additional OTPs dispensing methadone, more individuals would be engaged in treatment and would thereby be more likely to be stable and not in need of the services and support that SOAR-WV offers, including naloxone. *Id*. ¶¶ 91, 107–108. SOAR-WV could then focus its limited resources on connecting a smaller pool of individuals with OUD-related and other services. *Id*. Additionally, SOAR-WV volunteers would be able to refer more individuals to OTPs while conducting their naloxone distribution efforts. *Id*. ¶¶ 101, 106.

## II.    SOAR-WV Has Organizational Standing Because It Has Adequately Pled That Defendants' Violation of Disability Laws Causes It Direct Harm

The Complaint alleges that the moratorium and zoning restrictions violate federal disability rights laws, and that this violation forces SOAR-WV to expend resources that it would not otherwise spend in response to the harm to its core mission. The Complaint alleges that this harm is caused by the state's methadone moratorium and zoning restrictions and would be redressed by invalidating these statutes. Therefore, SOAR-WV has adequately pled the requirements for organizational standing.

Standing is a jurisdictional question, and when a federal court has jurisdiction to hear a case, it has a "virtually unflagging obligation" to exercise its jurisdiction. *Colo. River Water Conservation Dist. v. United States*, 424 U.S. 800, 817 (1976). To establish Article III standing, a plaintiff—regardless of whether they are an individual or an organization—must show: (1) an injury in fact; (2) that the injury was caused by the defendant; and (3) that the injury would likely be redressed by a favorable decision from the court. *Food & Drug Admin. v. All. for Hippocratic Med.*, 602 U.S. 367, 394 (2024) (hereinafter "*AHM*");[4] *Republican Nat'l Comm. v. N. Carolina State Bd. of Elections*, 120 F.4th 390, 395 (4th Cir. 2024) (hereinafter "*RNC*"). Title II of the ADA explicitly provides a remedy to "any person" alleging disability discrimination—regardless of whether they themselves are disabled. *A Helping Hand, LLC v. Baltimore Cnty., MD*, 515 F.3d 356, 363 (4th Cir. 2008) (holding that methadone clinic had standing to challenge a zoning ordinance that discriminated against methadone clinics). Standing under the ADA is thus construed as broadly as is permitted by Article III. *Id.* (citing *MX Grp.*, 293 F.3d at 334). When

---

[4] Defendants cite to Justice Thomas's concurrence in *AHM*, which relies for support on Justice Thomas's own dissent and concurrence in two prior cases, for the proposition that organizational standing is unavailable. Dkt. No. 27 at 9; 602 U.S. at 398 (citations omitted). The Court's opinion in *AHM* affirms and clarifies the availability of organizational standing.

standing is facially challenged at the 12(b)(1) stage, the court is required to "assume the truthfulness of the facts alleged." *Kerns*, 585 F.3d at 193. As acknowledged by Defendants, Dkt. No. 27 at 4, Plaintiff must prove standing "with the manner and degree of evidence required at the successive stages of litigation." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992). Thus, "[a]t the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice." *Id.*

### A. SOAR-WV Plausibly Alleges That It Suffers an Injury-In-Fact as a Result of the Methadone Moratorium and Zoning Restrictions

SOAR-WV is injured by the moratorium because the moratorium directly impinges on its core business activities—including making effective referrals to treatment—and consequently drains its resources. An injury is actual or imminent when it has previously occurred or is likely to occur soon. *AHM*, 602 U.S. at 381. When an action "perceptibly impairs" an organization's ability to carry out its mission and thus drains the organization's resources, "there can be no question that the organization has suffered an injury-in-fact." *RNC*, 120 F.4th at 396–97. While an organization may not "spend its way into standing" through a unilateral and uncompelled choice to shift its resources, a plaintiff has suffered an injury-in-fact where defendants' illegal activities directly affect and interfere with one of its core business activities. *AHM,* 602 U.S. at 394–95; *see also, e.g.*, *RNC*, 120 F.4th at 396–97 (holding that RNC's mission of electing Republican candidates was harmed by Defendant's alleged illegal refusal to strike voters from the voter roll, forcing them to divert resources to "combat election fraud"); *see also People for Ethical Treatment of Animals, Inc. v. Tri-State Zoological Park of W. Md., Inc.*, 843 F. App'x 493, 496 (4th Cir. 2021) (hereinafter "*PETA*") (holding that PETA's mission to protect animals was

impeded by a zoo that allegedly illegally mistreats animals, thereby preventing PETA from investigating other zoos' treatment of animals).[5]

The injury must be "more than simply a setback to the organization's abstract social interests," but rather must be a "concrete and demonstrable injury to the organization's activities—with the consequent drain to the organization's resources." *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982). The injury-in-fact does not need to be large, so long as it amounts to an "identifiable trifle." *United States v. Students Challenging Regul. Agency Procs. (SCRAP)*, 412 U.S. 669, 689 n.14 (1973); *Harper v. Va. State Bd. of Elections*, 383 U.S. 663, 668 (1966) (a $1.50 tax sufficed as an injury-in-fact). Indeed, "[a]ny monetary loss suffered by the plaintiff satisfies the injury-in-fact element; even a small financial loss suffices." *GenBioPro, Inc. v. Sorsaia*, No. 3:23-0058, 2023 WL 3211847, at *4–5 (S.D. W. Va. May 2, 2023) (quoting *Cottrell v. Alcon Labs.*, 874 F.3d 154, 163 (3d Cir. 2017)).

Here, SOAR-WV's core mission "to save lives, reduce harm and stigma, and empower individuals impacted by drug use" and its services that carry out this mission—including effective referrals to treatment—are directly impaired by West Virginia's illegal discrimination against people who use methadone to treat their OUD. Compl. ¶¶ 88, 101, 106. West Virginia's illegal statutes targeting OTPs limit where SOAR-WV can refer patients to receive methadone treatment for their OUD, akin to how illegal racial steering limited where the housing referral service in *Havens Realty* could refer people looking for housing. *See Havens Realty Corp.*, 455 U.S. at 379 ("If, as broadly alleged, petitioners' steering practices have perceptibly impaired HOME's ability to provide counseling and referral services for low- and moderate-income

---

[5] The *PETA* case has been cited approvingly by the Fourth Circuit after *AHM*. *RNC*, 120 F.4th at 396.

homeseekers, there can be no question that the organization has suffered injury in fact."). Because of these discriminatory statutes, SOAR-WV's referrals to treatment are often to less effective services than OTPs because the moratorium either eliminates the availability of methadone in a community or limits methadone to a single existing clinic. Compl. ¶ 90. SOAR-WV is thus compelled to spend additional time and resources in connecting clients with services who are denied access to the only OTP in Charleston, and those who, because of the moratorium, are unable to access methadone at all. *Id*. ¶¶ 89–91, 104–108. Further, SOAR-WV must spread its resources more thinly across the state, leaving it further from achieving its core mission of saturating the state in naloxone and requiring it to needlessly expend more resources it would not have to spend if West Virginia complied with federal disability law. *Id.* This injury is ongoing, as SOAR-WV continues to refer individuals to treatment services that have been illegally limited by the moratorium and zoning restrictions, and are thus less effective. *Id*. ¶ 103.

The Fourth Circuit has held that injuries like SOAR-WV's are cognizable injuries-in-fact. In the *RNC* case, the Fourth Circuit held that the RNC had suffered an injury to its core mission of electing Republican candidates because the North Carolina State Board of Elections failed to comply with the Help America Vote Act by failing to properly update the voter roll. This, in turn, forced the RNC to expend resources on combatting voter fraud, rather than focus their budget on "organizational and voter outreach efforts." *RNC*, 120 F.4th at 396–97 (holding that these activities were part of the RNC's core mission, not a mere attempt to "spend their way into standing" under the *AHM* framework). And in *PETA*, the Fourth Circuit found that PETA had suffered an injury to their core mission because a zoo failed to comply with the Endangered Species Act, forcing PETA to investigate and monitor the zoo, rather than "engage in mission-related campaigns against other zoos." *PETA*, 843 F. App'x at 496. Similarly, here, SOAR-WV

9

suffered an injury to its core mission of connecting individuals with OUD to evidence-based treatment and other services because West Virginia discriminates against individuals with OUD through the moratorium and zoning restrictions.

Defendants cite cases rejecting plaintiff organizations' attempt to "manufacture standing" by making voluntary budget choices to advocate against a policy. But those cases differ in at least two ways: 1) SOAR-WV is a service provider, rather than an advocacy organization, and its services are directly impacted by the moratorium and zoning restrictions; 2) SOAR-WV made no voluntary changes in its spending, but rather is forced to expend more resources on the services it provides because of West Virginia's violation of disability law.

First, the cases that Defendants cite rejected *advocacy* efforts as the basis for the organizational standing, whereas SOAR-WV solely points to the impacts of the moratorium and zoning restrictions on the *services* it provides to its participants. *Compare AHM*, 602 U.S. at 395 (discussing *Havens Realty* and noting that "[c]ritically, [plaintiff] HOME not only was an issue-advocacy organization, but also operated a housing counseling service.") *with D.C. by Chaplick v. Fairfax Cnty. Sch. Bd.*, 171 F.4th 255, 266 (4th Cir. 2026) (finding that advocacy activities like "[t]alking to parents," "[r]eaching out to regulators," "investigating the special needs education problems in Virginia," and "drafting op-eds" were insufficient to constitute injury-in-fact). Here, as in *Havens Realty*, SOAR-WV provides a range of *services* to its participants—including referral to drug treatment such as OTPs, statewide naloxone distribution, and help for those who are denied access to Charleston's only OTP, all of which are impeded by the moratorium and zoning restrictions. SOAR-WV does not rely on advocacy efforts as a basis for its injury-in-fact. These services distinguish SOAR-WV's injuries from a generalized grievance that could be shared by any member of the public. Groups like SOAR-WV and HOME provide services—

10

including referral services—that are directly hindered by illegal discrimination. Accordingly, this lawsuit does not allege a generalized grievance about a disfavored government policy shared broadly by many concerned citizens. Rather, it alleges a concrete harm to SOAR-WV's operations and ability to carry out its core mission.

Second, unlike plaintiffs in *AHM* and *Fairfax County School Board*, SOAR-WV does not point to voluntary spending in response to the moratorium and zoning restrictions as the basis for its injury-in-fact. *See Fairfax Cnty. Sch. Bd.*, 171 F.4th at 267 (holding that choosing to spend money on advocacy efforts in line with a group's mission does not constitute an injury-in-fact). Rather, SOAR-WV's complaint describes the way that the activities it was *already* engaged in for years before this litigation have been made more difficult, more expensive, and less effective as a result of the moratorium and zoning restrictions.[6] In other words, the state's illegal actions make it more expensive for SOAR-WV to carry out its core mission, which is precisely the test for an injury-in-fact to an organization. *AHM*, 602 U.S. at 395 (noting that the racial steering alleged in *Havens Realty* "directly affected and interfered" with the organizational plaintiff's "core business activities" of providing counseling and referral services).

Defendants assert that an increase in the need for services provided by an organization cannot amount to an injury-in-fact, Dkt. No. 27 at 8, but even its own citations are to the contrary. In *National Treasury Employees Union v. United States*, for example, the court noted that discrimination that increased the number of people who needed counseling services from an organization amounted to a cognizable injury-in-fact. 101 F.3d 1423, 1429 (D.C. Cir. 1996) (discussing *Fair Emp. Council of Greater Washington, Inc. v. BMC Mktg. Corp.*, 28 F.3d 1268

---

[6] As discussed in more detail *infra* at 13–14, a plaintiff can be cognizably injured by conduct that pre-dated its founding. *See Frame v. City of Arlington*, 657 F.3d 215, 238 (5th Cir. 2011) (en banc) ("[A] city's wrongful act and a disabled individual's injury need not coincide.").

11

(D.C. Cir. 1994)). Additionally, SOAR-WV is limited in the *range* of services it can provide, and it is not simply obliged to provide more services: SOAR-WV cannot refer people to the methadone clinics that have not opened because of the moratorium, and is thus less effective at its core business activities. Therefore, SOAR-WV suffers a cognizable injury-in-fact as a result of the moratorium and zoning restrictions.

### B. SOAR-WV Plausibly Alleges Its Injuries Were Caused by and Traceable to the Moratorium and Zoning Restrictions

The injuries SOAR-WV suffers are fairly traceable to the moratorium and zoning restrictions because they directly impact its ability to carry out its core mission. For an injury to be considered traceable, "there must be a causal connection between the injury and the conduct complained of" by the plaintiff. *Lujan*, 504 U.S. at 560. "While the defendant's conduct need not be the last link in the causal chain, the plaintiff must be able to demonstrate that the alleged harm was caused by the defendant, as opposed to the 'independent action of some third party not before the court.'" *Air Evac EMS, Inc. v. Cheatham*, 910 F.3d 751, 760 (4th Cir. 2018) (citation omitted). Thus, "to establish causation, the plaintiff must show a predictable chain of events leading from the government action to the asserted injury—in other words, that the government action has caused or likely will cause injury in fact to the plaintiff." *AHM*, 602 U.S. at 385.

As explained above, SOAR-WV's alleged injuries are caused directly by the moratorium and zoning restrictions. The moratorium causes direct harm to SOAR-WV's core business activities and mission by preventing it from being able to provide referrals to effective treatment, forcing it to expend resources supporting individuals who cannot receive methadone, and spreading its resources more thinly across the state. Compl. ¶¶ 101–108. Without the moratorium and zoning restrictions, additional OTPs would open across West Virginia, including in

12

Charleston, and allow disabled individuals meaningful access to OTPs, in turn freeing SOAR-WV to make referrals to a broader network of OTPs. *Id*. ¶¶ 101, 104, 106.

Defendants argue that because it is not "guaranteed that an individual receiving methadone treatment will not overdose," and there are other medications that treat opioid use disorder, Plaintiff has not shown proper causation. Dkt. No. 27 at 11. However, this argument misapprehends both law and fact. Legally, Plaintiff need not prove a "guarantee" that access to methadone prevents all overdoses, but rather Plaintiff must show that Defendants' conduct lead to its injury, even if it is not the last link in the causal chain. *Cheatham*, 910 F.3d at 760. Factually, Plaintiff asserts that for many West Virginians, methadone is the *only* effective treatment due to both biological factors and the rise of fentanyl, and that it cuts the risk of mortality by over half for people with OUD. Compl. ¶¶ 51, 53, 61; *Kerns*, 585 F.3d at 192 (holding that courts must assume the truthfulness of facts alleged on a facial 12(b)(1) motion to dismiss). By restricting access to methadone, the moratorium and zoning restrictions lead to the predictable harm of restricting SOAR-WV's referral service to a narrower band of treatment options and impeding its core activities of providing services to individuals with OUD.

Nor is it a valid defense that the moratorium was already in effect before SOAR-WV formed eight years ago. Indeed, Defendants cite no authority to support this novel proposition. Dkt. No. 27 at 14. Defendants have been violating federal disability law since the day the moratorium and zoning restrictions were enacted, and SOAR-WV is currently being injured by not being able to provide effective referral services, thereby harming its mission and draining its resources. *See Frame*, 657 F.3d at 238 ("[A] city's wrongful act and a disabled individual's injury need not coincide. A city acts wrongfully when it builds an inaccessible sidewalk without adequate justification, but a disabled individual is not injured until he is actually deterred from

13

using that sidewalk."); *Atl. States Legal Found. v. Al Tech Specialty Steel Corp.*, 635 F. Supp. 284, 288 (N.D.N.Y. 1986) (holding that legal violations that predate an organization's founding can still cause legally cognizable injuries). Additionally, the increased presence of fentanyl in the drug supply since SOAR-WV was formed has made methadone treatment even more important for its participants with OUD. Compl. ¶¶ 44–49. SOAR-WV has made efforts to work around the moratorium to provide services to its participants, but it continues to be injured by West Virginia's discrimination and therefore brings this challenge. *See id*. ¶¶ 94–103.

Nor are the individual Defendants at the Department of Health and the West Virginia Health Care Authority improperly named simply because the Authority "literally has no power" to grant certificates of need for OTPs due to the moratorium. Dkt. No. 27 at 13; *see Bostic v. Schaefer*, 760 F.3d 352, 372 (4th Cir. 2014) (holding that the Registrar of Vital Records was an appropriate defendant for causation/traceability purposes in a same-sex marriage case because the Registrar "develop[ed] the marriage license application form," despite the fact that Virginia law prohibited the Registrar from recognizing same-sex marriage). "A plaintiff's injury can also be traced to an official who is charged with the authority to enforce, or has definite responsibilities related to" an allegedly illegal statute. *S.C. Elec. & Gas Co. v. Randall*, 331 F. Supp. 3d 485, 498 (D. S.C. 2018) (internal quotations omitted). Likewise here, the named Defendants can properly be sued even though they currently have no authority under state law to issue a certificate of need because they are specifically charged with enforcing the moratorium and zoning requirements. Compl. ¶¶ 21–27. If the moratorium and zoning requirements are lifted, these Defendants would have the power to issue certificates of need to OTPs, and thus allow them to open. Plaintiff has therefore adequately alleged its injury is fairly traceable to Defendants' illegal conduct.

### C. SOAR-WV Plausibly Alleges Its Injuries Would Be Redressed by a Favorable Ruling Invalidating the Moratorium and Zoning Restrictions

SOAR-WV's injury would be redressed by invalidation of the moratorium and zoning restrictions, as West Virginia's compliance with federal disability law would free SOAR-WV to expend resources—which it currently spends responding to the harms caused by the state statutes at issue—in furtherance of its mission and allow it to refer individuals to more effective treatment modalities. To find redressability, a court must determine that "it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Sierra Club v. United States Dep't of the Interior*, 899 F.3d 260, 284 (4th Cir. 2018). Causation and redressability are often described as "flip sides of the same coin" because "[i]f a defendant's action causes an injury, enjoining the action or awarding damages for the action will typically redress that injury." *AHM*, 602 U.S. at 381. Redressability does not require that the injury be completely ameliorated by a favorable ruling. *See Massachusetts v. E.P.A.*, 549 U.S. 497, 526 (2007). In fact, "[t]he removal of even one obstacle to the exercise of one's rights, even if other barriers remain, is sufficient to show redressability." *Deal v. Mercer Cnty. Bd. of Educ.*, 911 F.3d 183, 190 (4th Cir. 2018).

Here, SOAR-WV has shown that its injury is redressable by a favorable decision because lifting the moratorium and zoning restrictions would result in more OTPs opening across the state, which would allow SOAR-WV to more easily execute its mission of saving lives, reducing harm and stigma, and empowering individuals impacted by drug use. Compl. ¶¶ 85, 91–92. These allegations, for purposes of a facial motion to dismiss for lack of standing, must be presumed to be true. *Kerns*, 585 F.3d at 192. Contrary to Defendants' assertion, Plaintiff does not ask that the court order any third party to take any action. Dkt. No. 27 at 16. Rather, Plaintiff asserts that without a total ban on new methadone clinics and without zoning restrictions that

15

make it more difficult for new OTPs to find locations, new OTPs will predictably open—as they have nationwide, even in other states that apply regulatory requirements including certificates of need. *See* Compl. ¶ 77 (noting that in 2011 there were 1,189 methadone clinics nationwide, compared to over 2,100 in 2026).[7] Allowing new clinics to open will permit SOAR-WV to operate in a more cost-effective and efficient manner, ameliorating its claimed injury.

Defendants argue that SOAR-WV cannot satisfy the redressability requirement, because the challenged law regulates third parties—i.e., methadone providers—and therefore "redressability hinges on the method and manner in which third parties not before the court would react." Dkt. No. 27 at 18. This argument is without merit. First, Defendants rely on *Trump v. CASA, Inc.,* a case that is wholly inapposite. 606 U.S. 831 (2025). The question in *CASA* was not whether plaintiffs established redressability, but "whether, under the Judiciary Act of 1789, federal courts have equitable authority to issue universal injunctions." *Id.* at 839. SOAR-WV is not seeking a universal injunction, and the holding in *CASA,* which does not discuss redressability, has no bearing on this case.

Second, Defendants cite *Diamond Alternative Energy, LLC v. E.P.A.*, a Supreme Court decision that in fact supports a finding of redressability here. 606 U.S. 100 (2025). In *Diamond Alternative Energy*, liquid fuel manufacturers challenged a federal agency decision approving a state regulation of car manufacturers, requiring them to produce more electric vehicles. *Id.* at 104–05. The car manufacturers were not before the Court, and redressability hinged on how both the state and the car manufacturers would react to a decision favorable to the fuel manufacturers. *Id.* at 112–13. The Court nevertheless held that the redressability requirement was satisfied,

---

[7] If this case moves to summary judgment, Plaintiff intends to offer expert testimony that will demonstrate how OTPs are likely to react in the absence of the moratorium and zoning restrictions.

because it was predictable how the car manufacturers would react based on "commonsense economic realities." *Id.* at 116. Specifically, if regulations limiting fuel-powered cars were lifted, the car manufacturers would likely produce more of them, and fuel manufacturers in turn would sell more of their product. *Id.*

The same rationale applies here. The Court should decide, based on "commonsense economic realities," that methadone providers, which include for-profit entities as well as non-profit providers, will likely respond to the lifting of the moratorium by opening new clinics in a market that is deeply underserved. *See* Compl. ¶¶ 53, 79–82; *GenBioPro, Inc.*, 2023 WL 3211847, at *6–7 ("Just as the Supreme Court has in the past assumed that people will continue to seek beer, contraceptives, and abortion, the Court finds here that it is reasonable to assume pharmacies and doctors will continue to prescribe and purchase abortion medication."). If Defendants truly believe that it is speculative that new clinics would open upon the lifting of the moratorium, it is unclear why the moratorium is in place at all. Presumably the moratorium was enacted to stop any new clinics from opening. Under these circumstances, redressability is just as likely as it was in *Diamond Alternative Energy*.

Like the Supreme Court in *Diamond Alternative Energy*, the Fourth Circuit has repeatedly held that a plaintiff can satisfy the redressability requirement even when the challenged government action regulates a third party not before the court, and the effect of a favorable ruling depends on independent actions by those third parties. For instance, the Fourth Circuit found in *Sierra Club* that environmental groups had established redressability in a case challenging the National Park Service's approval of a gas pipeline, where plaintiffs claimed the approved route would disrupt their enjoyment of public lands. 899 F.3d at 266. Defendant argued that relief was speculative because there was no guarantee that the pipeline would not simply be

17

re-authorized for a different, but equally disruptive route along the public lands, thereby erasing any potential benefit to plaintiffs. *Id.* at 285. The court rejected that argument, holding that "the requested relief would at least mitigate, if not eliminate, the alleged harm." *Id.*

In *Lansdowne on the Potomac Homeowners Ass'n, Inc. v. OpenBand at Lansdowne, LLC*, plaintiffs challenged an exclusivity contract between a homeowners' association and a cable provider. 713 F.3d 187, 197–98 (4th Cir. 2013). Defendants argued that redressability was speculative because "the courts cannot order any alternative provider to provide service or even negotiate" with the association. *Id.* at 197 (internal quotation omitted). The court held that redressability was nevertheless established because it was sufficiently likely that other providers would enter the market once the exclusivity provision was removed. *Id.*

These cases establish that none of Defendants' arguments here present an actual barrier to establishing redressability. It is no bar that the moratorium and zoning restrictions are directed at methadone providers rather than SOAR-WV, and that the providers are not before the court. For redressability, a favorable ruling need not guarantee with absolute certainty that additional methadone providers will ultimately open. All SOAR-WV has to show is that lifting the moratorium and zoning restrictions will likely result in more methadone providers operating in West Virginia, which in turn will result in some benefit to SOAR-WV.

Finally, Defendants assert in a cursory manner and without any case support that these clinics would have to operate in "perpetuity" for SOAR-WV's injury to be addressed. Dkt. No. 27 at 18. That argument is wrong. An injury does not have to be completely ameliorated to satisfy redressability requirements. *Massachusetts*, 549 U.S. at 526. A plaintiff need only show that it "would benefit in a tangible way from the court's intervention." *Sierra Club*, 899 F.3d at 284–85. In fact, the Supreme Court held in *Diamond Alternative Energy* that "even 'one dollar'

18

of additional revenue for the [plaintiff] would satisfy the redressability component of Article III standing." 606 U.S. at 114. Here, Plaintiff requests declaratory and injunctive relief that would remove a significant impediment to their providing an effective referral service to drug treatment, including OTPs, and other services to individuals with OUD. Such relief is more than sufficient to satisfy the redressability requirement.

## CONCLUSION

For the foregoing reasons, the Court should deny Defendants' Motion to Dismiss.

Dated: May 18, 2026
Charleston, West Virginia

Respectfully submitted,
/s/ Aubrey Sparks
Aubrey Sparks (WV Bar No. 13469)
asparks@acluwv.org
ACLU WEST VIRGINIA
606 Virginia St. E
Charleston, WV 25301
(304) 202-3435

Joseph Longley* (DC Bar No. 90031392)
JLongley1@aclu.org
Sarah Steege* (MD Bar No. 1306190292)
SSteege@aclu.org
AMERICAN CIVIL LIBERTIES UNION
915 15th St. NW, Seventh Floor
Washington, D.C. 20005

Zoe Brennan-Krohn* (CA Bar No. 324912)
ZBrennan-Krohn@aclu.org
AMERICAN CIVIL LIBERIES UNION
425 California St., Seventh Floor
San Francisco, CA 94104

David Howard Sinkman* (NY Bar No. 4684981)
sinkman@kaplangrady.com

19

Matthew Underwood* (MA Bar No. 684609; DC Bar No. 1030122)
matthew@kaplangrady.com
Amelia Caramadre* (MA Bar No. 710230)
amelia@kaplangrady.com
KAPLAN & GRADY LLC
2071 N. Southport Ave., Ste. 205
Chicago, IL 60614

*Admitted pro hac vice*

20