**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

SOLUTIONS ORIENTED ADDICTION
RESPONSE WEST VIRGINIA,
  *Plaintiff,*

v.

               **No. 3:26-cv-00175**
               **Judge Chambers**

STATE OF WEST VIRGINIA, *et al.*,
  *Defendants*.

### <u>REPLY IN SUPPORT OF MOTION TO DISMISS</u>

The State of West Virginia (the "State"),[1] by the undersigned counsel, states as follows in

support of its Motion to Dismiss, ECF 26 (the State's "Motion"):

### <u>Summary of Argument</u>

In this action, Plaintiff alleges that a statewide moratorium and zoning restrictions on new

methadone clinics has frustrated Plaintiff's ability to fulfill its "core mission of saturating the state

with naloxone." Resp. 9 (citing Compl. ¶¶ 29–91, 104–08) (the "Response").

Plaintiff does not allege that the moratorium and zoning restrictions apply to Plaintiff, and

it is clear that neither the moratorium nor the zoning restrictions require Plaintiff to do (or refrain

from doing) anything at all. Instead, Plaintiff argues that the moratorium and zoning restrictions

have caused Plaintiff to "expend resources it otherwise would not spend, responding to the needs

of individuals who cannot receive methadone." Compl. ¶ 12.

Plaintiff alleges that it has been injured in "two primary ways":

First, the moratorium and zoning restrictions limit [Plaintiff's] ability to refer the
individuals it serves to effective treatment options, forcing them to expend

---

[1] The "State" means all Defendants: Patrick Morrisey in his official capacity as Governor of West Virginia; Arvin Singh in his official capacity as the West Virginia Secretary of Health; the West Virginia Department of Health; Gordon C. Lane, Jr. in his official capacity as Executive Director of the West Virginia Health Care Authority; Robert Cheren in his official capacity as Chairman of the West Virginia Health Care Authority; and the West Virginia Health Care Authority.

> resources providing services to individuals who would otherwise be receiving effective treatment . . . .
>
> Second, [Plaintiff] is forced to expend more resources in its statewide naloxone distribution efforts and is further from achieving its core mission of saturating the state with naloxone because there is a larger pool of individuals who are at risk of overdose because of the moratorium and zoning restrictions.

Compl. ¶¶ 89–91. Finally, Plaintiff alleges that "[i]f the moratorium and zoning restrictions were lifted, more OTPs would open across the state of West Virginia, and OTPs would have an easier time finding appropriate locations to operate." Compl. ¶ 87.

Plaintiff's claims fail because it cannot establish any of the elements of standing:

***First***, Plaintiff has not alleged any direct injuries to its core mission of saturating the state with naloxone. At most, Plaintiff has alleged that the moratorium and zoning restrictions indirectly led Plaintiff to reallocate its resources, and self-imposed spending decisions cannot form the basis of standing.

***Second***, Plaintiff still has not identified *any* actions that *any* of the defendants took to cause the injuries alleged. The Response does absolutely nothing to ameliorate that issue, claiming only (and without support) that "the named Defendants can properly be sued even though they currently have no authority under state law to issue a certificate of need because they are specifically charged with enforcing the moratorium and zoning requirements." Resp. 14. But Plaintiff does not identify *how* any such defendants are charged with enforcing the moratorium and zoning restrictions, and this Court is not under any obligation to accept Plaintiff's legal conclusions as true. Accordingly, even if Plaintiff could establish an injury in fact—which it cannot—Plaintiff has not alleged facts sufficient to establish that any of the defendants can be held liable.

***Third***, while it may be true, as Plaintiff suggests, that the redressability element of standing can be met even when the injury will not be completely ameliorated, Plaintiff has not established that a favorable ruling in this action will do *anything* to redress the injuries alleged. Plaintiff is not

a methadone provider and does not intend to become one, so granting the relief requested would change absolutely nothing about Plaintiff's position. Accordingly, even if Plaintiff could establish that any of the defendants injured Plaintiff in a legally cognizable manner—which it cannot—Plaintiff cannot establish that a favorable ruling would ameliorate Plaintiff's alleged injuries, in full or in part. Accordingly, Plaintiff's alleged injuries are not redressable.

*      *      *

In its Response, Plaintiff attempts to distinguish itself from organizations that courts have determined lacked standing due to their voluntary spending choices, arguing that Plaintiff is a "service provider," not an "advocacy organization." Resp. 10. But none of the cases upon which Plaintiff relies for that proposition make that distinction dispositive, and courts have made clear that to the extent providing "services" can provide a basis for organization standing, the determinative questions are *what* services the plaintiff provides, whether the defendant *directly* affected the plaintiff's ability to provide those services, and whether a court ruling can redress the injuries alleged.

Accordingly, it is important first to reflect on precisely what services Plaintiff alleges it provides:

1. Plaintiff "works with people who have . . . substance use disorders to connect them with treatment, recovery, and overdose prevention services." Compl. ¶ 12.

2. Plaintiff "has volunteers and partners in all 55 counties in West Virginia, who are responsible for distributing naloxone . . . as well as connecting individuals they encounter with treatment and other support services through the peer recovery coaches with whom they work." Compl. ¶ 17.

3. Plaintiff "also hosts monthly mutual aid fairs in Charleston that connect individuals with OUD to treatment, housing, and other social services." Compl. ¶. 18.

3

In other words, the sum of Plaintiff's involvement with methadone treatment services is that Plaintiff and/or its volunteers occasionally "connect" drug users with a variety of available addiction treatment options, including methadone clinics.

Plaintiff's Response highlights several fatal flaws in its position, each of which are independently dispositive of the fact that Plaintiff does not have and cannot establish standing for the claims alleged. Accordingly, the Complaint should be dismissed.

### Uncontested Facts

1. Plaintiff is not an opioid treatment program provider, and it does not intend to become one.

2. Neither the moratorium nor the zoning restrictions require or forbid Plaintiff to do or refrain from doing anything.

3. Neither the Governor nor the Secretary of Health play any role in enforcing the moratorium or zoning restrictions.

### Argument

### I.    Legal Standard

The parties agree that "[s]tanding is a jurisdictional question," Resp. 6. The parties also agree that the basic minimum constitutional requirements for standing require "a plaintiff, regardless of whether they are an individual or an organization—[to] show: (1) an injury in fact; (2) that the injury was caused by the defendant; and (3) that the injury would likely be redressed by a favorable decision from the court." Resp. 6 (citing *FDA. v. All. For Hippocratic Med.*, 602 U.S. 367, 394 (2024) [hereinafter "*Alliance*"]).

The State separately observes that at "the pleading stage, the plaintiff must clearly allege facts demonstrating each element" of standing. *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016). And "[w]hen the suit is one challenging the legality of government action or inaction, the nature and extent of facts that must be averred . . . depends considerably upon whether the plaintiff is

4

himself an object of the action (or foregone action) at issue." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992). Indeed, unregulated parties must establish "much more" than mere injury. *Id.* at 562. In such cases, "it becomes the burden of the plaintiff to adduce facts showing that those choices have been or will be made in such a manner as to produce causation and permit redressability of [the] injury." *Id.* (emphasis added).

## II. Plaintiff does not have standing.

Plaintiff premises its injuries on the government's regulation of methadone clinics, and it claims that a favorable decision in this action will result in "additional OTPs [opening] across West Virginia, including in Charleston . . . in turn freeing [Plaintiff] to make referrals to a broader network of OTPs." Resp. 12–13. But Plaintiff does not allege that it is a methadone provider, much less that it has applied or intends to apply for a license to operate a methadone clinic. Importantly, Plaintiff does not identify anyone else that has applied for or intends to apply for a license to operate a methadone clinic, either. Plaintiff simply tells this Court: "if you grant the relief requested, the clinics will come." No court has ever found that a plaintiff had standing under the circumstances alleged, and this Court should not, either.

Plaintiff also does not describe what resources it has had to expend as a result of the moratorium and zoning restrictions. Plaintiff does not allege that it provides transportation services for methadone treatment, and Plaintiff does not allege that "connecting" an individual with opioid use disorder with the nine opioid treatment centers Plaintiff acknowledges already exist is somehow more resource intensive than referrals to the clinics Plaintiff wishes would materialize. Plaintiff's unsupported musings cannot provide a basis for standing. Accordingly, the Complaint should be dismissed.

**(a)      Plaintiff has not alleged any legally cognizable injuries.**

Plaintiff argues that the moratorium "directly impinges on its core business activities—including making effective referrals to treatment—and consequently drains its resources." Resp. 7. Plaintiff premises its alleged injuries on the notion that the moratorium and zoning restrictions "force[] [Plaintiff] to expend resources that it would not otherwise spend in response to the harm to its core mission." Resp. 6.

Plaintiff acknowledges that "an organization may not 'spend its way into standing' through a unilateral and uncompelled choice to shift its resources." Resp. 7 (quoting *Alliance*, 602 U.S. at 394–95). Yet, according to Plaintiff, standing exists because the moratorium and zoning restrictions "make it more expensive for [Plaintiff] to carry out its core mission." Resp. 11 (citing *Alliance*, 602 U.S. at 395).

Importantly, though, Plaintiff has not established a nexus between the moratorium and zoning restrictions, which affect only methadone clinics, and Plaintiff's core mission of saturating the state in naloxone, which the moratorium and zoning restrictions do not touch in any way. In other words, Plaintiff has not alleged any direct injuries that are *independent* of its voluntary spending decisions. *See Nat'l Fair Hous. All. v. Bank of America, N.A.*, No. SAG-18-1919, 2025 WL 2030225, at *6 (D. Md. July 21, 2025) ("[S]tanding requires 'a perceptible impairment to a 'core business activity' that is independent of the organization's decision to 'divert its resources.'") (quoting *Alliance* at 394–95) (cleaned up).

Indeed, "[e]ven under the pre-[*Alliance*] regime, standing based on diversion of resources required that the organization's activities in response to defendant's conduct detract or differ from its routine activities." *Id.* at *8 (quoting *Alliance*, 602 U.S. at 395); *see Knowledge Ecology Int'l v. NIH*, No. 18-1130, 2019 WL 1585285, at *6 (D. Md. Apr. 11, 2019) (finding the plaintiff manufactured its injury because "[a]ny resources [the plaintiff] spent on . . . the underlying

6

events . . . seem very much in line with [its] core mission rather than a diversion of its resources away from it").

Here, Plaintiff argues that the moratorium and zoning restrictions have affected its ability to perform its core business function of "connecting" drug users with methadone treatment services. Resp. 10. But Plaintiff does not allege any facts in support of that argument because neither the moratorium nor the zoning restrictions *in any way* frustrate Plaintiff's ability to "connect" drug users with the full range of drug treatment services that are available in West Virginia, including the nine methadone clinics that Plaintiff acknowledges already exist. And notably, the Complaint is silent as to what effect—if any—the moratorium and zoning restrictions have had on Plaintiff's core mission of saturating the state with naloxone. Notably, Plaintiff has not even alleged injury to that mission, which Plaintiff repeatedly identifies as its primary focus.

Plaintiff argues that its injuries are "akin to how illegal racial steering limited where the housing referral service in *Havens* [] could refer people looking for housing." Resp. 8 (citing *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982) [hereinafter "*Havens*"]). But Plaintiff's claims have *nothing* in common with those in *Havens*, in which the Supreme Court held that a housing counseling service had standing to assert racial steering when the defendant realty company provided misleading information to one of the plaintiff's black employees. *See id*. In response, the housing counseling service had to divert resources it would normally devote to housing placement to "identify and counteract the defendant's racially discriminatory steering practices." *Id.*; *see Fair Emp. Council of Greater Washington, Inc. v. BMC Marketing, Corp.*, 28 F.3d 1268, 1277 (D.C. Cir. 1994) ("The Court [in *Havens*] did not base standing on the diversion of resources from one program to another, but rather on the alleged injury that the defendants' actions themselves had inflicted upon the organization's programs.").

Here, Plaintiff does not allege that the State misled Plaintiff about existing treatment options or otherwise attempted to steer drug users away from available treatment options. Instead, Plaintiff's position is that the "connecting" services it provides would be more effective if there were more methadone clinics to which Plaintiff could refer drug users. In the *Havens* context, Plaintiff's claims would be akin to challenging a governmental action that did not provide as many public housing options as the housing counseling service would have liked, and there is nothing in *Havens* to suggest that standing would have existed in those circumstances. Certainly, there is nothing in this action to occasion a departure from *Havens*, as Plaintiff has not had to change *anything* about the services it provides as a result of the moratorium and zoning restrictions.

Plaintiff also compares its injuries to those for which the Fourth Circuit determined the plaintiff had standing in *Republican Nat'l Comm. v. N. Ca. Bd. of Elections*, 120 F.4th 390 (4th Cir. 2024) [hereinafter "*RNC*"] (finding political parties had standing to allege violation of a federal statute that was intended to improve voting systems and voting access based on allegations that the defendant refused to strike certain registered voters from the state's voter rolls). In *RNC*, the plaintiffs alleged they were "unable to ascertain which of the 225,000 people who [the defendants] allege registered improperly will be able to vote in the upcoming election." *Id.*

Though none of the parties contested standing, the Fourth Circuit addressed the issue *sua sponte*, holding that organizations whose core missions involve electing specific candidates had standing based on allegations that they had to divert funds from those causes to root out voter fraud when the defendant failed to fulfil its lawful obligation to do so. *See id.* at 395–97. But Plaintiff does not allege that the State is refusing to perform some affirmative obligation it is required to perform, and the injuries alleged do not directly affect its mission. Instead, Plaintiff alleges there should be more methadone clinics to which it and its volunteers can "connect" the drug users they

8

encounter. Compl. ¶ 17. At best, such injuries (if established) are *indirect* to Plaintiff's mission of saturating the state with naloxone. Accordingly, the injuries alleged cannot form the basis for standing. *See Nat'l Treasury Emp. Union v. United States*, 101 F.3d 1423, 1430 (D.C. Cir. 1996) ("[W]here an organization alleges that a defendant's conduct has made the organization's *activities* more difficult, the presence of a <u>direct</u> conflict between the defendant's conduct and the organization's *mission* is necessary—though not alone sufficient—to establish standing.") (underline added, italics in original).

Plaintiff attempts to distinguish itself from the losing party in *Chaplick*, which could not establish standing by "undertaking activities like talking to parents, reaching out to regulators, investigating the special needs problems in Virginia, and drafting op-eds on the problems in Virginia." *D.C. by Chaplick v. Fairfax Cnty. Sch. Bd.*, 171 F.4th 255, 266 (4th Cir. 2026). But Plaintiff does not explain how the functions it performs (like distributing naloxone and performing community cleanups) qualify as standing-providing "services," while the services the plaintiff in *Chaplick* performed (like communicating with lawmakers and drafting op-eds) do not. And again, regardless, the distinction between "services" and advocacy is immaterial—the critical question is whether the government's action "directly affected and interfered with [the plaintiff's] core business activities—not dissimilar to a retailer who sues a manufacturer for selling defecting goods to the retailer." *Alliance*, 602 U.S. at 367.

Here, Plaintiff does not allege that the State (or anybody else) has provided it with misleading information regarding methadone treatment programs. Indeed, Plaintiff does not allege that the State has done *anything* to restrict, forbid, or in any way frustrate its organizational purpose of connecting individuals with existing treatment options—Plaintiff simply wants more options.

9

Finally, Plaintiff compares its circumstances to the standing-providing injuries at issue in *People for Ethical Treatment of Animals, Inc. v. Tri-State Zoological Park of Western Md.*, in which the Fourth Circuit found that a plaintiff that is "required by its mission to protect and rescue animals from abuse and neglect" had standing to sue a zoo for violations of the Endangered Species Act. *See* 843 F.App'x 493 (4th Cir. 2021) (hereinafter "*PETA*"). But *PETA* cuts against Plaintiff in every way. While it is true that the Fourth Circuit determined the plaintiff had standing, its standing was premised on *direct* injuries to the plaintiff's mission of rescuing animals, and the consequent drain on its resources resulted from shifting resources from activities like public education and protest campaigns to submitting complaints against the defendant and investigating, monitoring, and reporting on the defendant's activities. *See id.* at 496. Most significantly, *PETA* stands for the proposition that "a plaintiff has suffered an organizational injury if the challenged policy or practice frustrated *both* its purpose *and* caused a drain on its resources." *Id.* (emphasis added). Plaintiff cannot satisfy either element, and thus the Complaint should be dismissed.

**(b)   Plaintiff has not shown that any of the defendants caused or could have caused the injuries alleged.**

"[T]he standing inquiry must be evaluated separately as to each defendant." *Disability Rights S. Ca. v. McMaster*, 24 F.4th 893, 900 (4th Cir. 2022) ("[I]n order to be a proper defendant in an action to enjoin an allegedly unconstitutional state law, the [defendant official] must have 'a specific duty to enforce' that law.") (quoting *Hutto v. S.C. Ret. Sys.*, 773 F.3d 536, 550 (4th Cir. 2014).

In the Response, as with the Complaint, Plaintiff is silent as to what role (if any) the individual defendants have in the moratorium and zoning restrictions, much less that any such defendant has a *specific duty* to enforce them. Indeed, Plaintiff has failed to even set forth arguments as to why each (or any) of the individual defendants may be held liable. This is

10

particularly true with respect to the Governor and Secretary of Health, for whom Plaintiff does not even attempt to connect to the moratorium or zoning restrictions, much less that either has a specific duty to enforce them. Accordingly, Plaintiff has not established that *any* of the defendants caused Plaintiff's alleged injuries, and the Complaint accordingly should be dismissed.

### (c)    Plaintiff's alleged injuries are not redressable, in whole or in part.

The parties agree that "[t]o find redressability, a court must determine that 'it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.'" Resp. 15 (quoting *Sierra Club v. United States Dep't of the Interior*, 899 F.3d 260, 284 (4th Cir. 2018). However, the parties disagree strongly on the degree of redressability that must be present before a case is "redressable." Indeed, the State reiterates that redressability is especially "problematic when third persons not party to the litigation must act in order or an injury to arise or be cured." *McMaster*, 24 F.4th at 903 (quoting *Doe v. Dep't of State Police*, 713 F.3d 745, 755 (4th Cir. 2013) (dismissing action against governor and attorney general because neither had responsibility for enforcing the challenged law, so the requested injunction would have no effect).

In its Response, Plaintiff claims that "[r]edressability does not require that the injury be completely ameliorated by a favorable ruling, *id.* (citing *Massachusetts v. EPA*, 549 U.S. 497, 526 (2007), such that removing "even one obstacle to the exercise of one's rights, even if other barriers remain, is sufficient to show redressability, *Deal v. Mercer Cnty. Bd. of Educ.*, 911 F.3d 183, 190 (4th Cir. 2018). Plaintiff reads far too much from these cases, as neither stands for the propositions asserted (*i.e.*, that removing barriers satisfies redressability even if it doesn't ameliorate the injuries alleged). Indeed, "[i]f the plaintiff does not claim to have suffered an injury that the defendant caused and that the court can remedy, there is no case or controversy for the federal court to resolve." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021).

Put differently, "a plaintiff satisfies the redressability requirement when he shows that <u>a favorable decision will relieve a discreet injury to himself</u>. He need not show that a favorable decision will relieve his *every* injury." *Larson v. Valente*, 456 U.S. 228, 244, n. 15 (1982) (underline added, italics in original).

Similarly, in *Deal*, the Fourth Circuit determined that a plaintiff had standing to contest a school board's decision to include voluntary bible classes in its course curriculum despite the fact that the student had subsequently enrolled in a neighboring school district. 911 F.3d 183, 189 (4th Cir. 2018). In response to arguments that the student's decision to disenroll from the school district rendered the student's claims non-redressable, the Fourth Circuit concluded that an injunction against the bible classes would redress at least one of the student's injuries insomuch as the student's mother "would no longer feel compelled to send [the student] to a neighboring school district." *Id.*

The cases upon which Plaintiff relies stand only for the proposition that the redressability element of standing requires at least *some* redressability but does not require complete redress. Here, though, Plaintiff has not established that the relief requested will result in *any* redress because Plaintiff has not pleaded any "facts" to support its bare assertion that more methadone clinics will inhere from a favorable ruling. Plaintiff argues that it does not ask the Court to order any third parties to take any actions, opining that "new OTPs will predictably open." Resp. 15. But Plaintiff's unsupported opinion of the methadone market in West Virginia is pure speculation, and there are absolutely no facts before the Court suggesting that Plaintiff's visions will become reality.

The relief requested illustrates the peril of its predicament in that Plaintiff seeks a declaration that the State has violated "Plaintiff's rights under [the Disability Acts]." Compl. 36-37. But Plaintiff has not identified *which* of *Plaintiff's* rights the State has violated. Similarly,

12

Plaintiff seeks an injunction against enforcement of the moratorium and zoning restrictions, but Plaintiff does not allege that it intends to file an application that the moratorium and zoning restrictions would prohibit. Plaintiff does not even allege that anyone else intends to do so, it simply presumes (without evidence) that someone will.

This Court does not have jurisdiction to create methadone clinics, and Plaintiff does not allege that it intends to operate any methadone clinics. Furthermore, even if the moratorium and zoning restrictions were never enacted, the application process for a certificate of need involves public policy decisions that are solely within the purview of the political branches. Accordingly, even if this Court granted the relief requested, and even if there was a line of would-be providers lined up to apply for a certificate of need, there *still* would be no guarantee that additional methadone clinics open.

Assuming, *arguendo*, that this Court entered the relief requested, absolutely nothing would change about the Plaintiff's position. None of the resources Plaintiff claims to have redirected could be restored to their original purposes because the Court's ruling would not result increase the supply of methadone. Accordingly, the relief requested would do absolutely nothing to ameliorate Plaintiff's position, and the Complaint should thus be dismissed.

### Conclusion

Plaintiff has not pleaded and cannot establish any of the requisite elements for organizational standing. Accordingly, this Court does not have subject matter jurisdiction, and it must take no action but dismiss Plaintiff's Complaint pursuant to Rule 12(b)(1) of the *Federal Rules of Civil Procedure* for failure to establish subject matter jurisdiction.

**THE STATE OF WEST VIRGINIA,**

**By counsel,**

**J.B. MCCUSKEY,**

Case 3:26-cv-00175   Document 31   Filed 06/02/26   Page 14 of 14 PageID #: 210

**ATTORNEY GENERAL**

/s/ Christopher S. Etheredge
Jace H. Goins (WVSB No. 7894)
*Chief Deputy Attorney General*
Steven R. Compton (WVSB No. 6562)
*Deputy Attorney General*
Christopher S. Etheredge (WVSB No. 13835)
*Assistant Attorney General*
Andrew T. Waight (WVSB No. 13276)
*Assistant Attorney General*
State Capitol Complex
1900 Kanawha Blvd, East
Office of the Attorney General
Charleston, WV 25314
Telephone: (304) 558-2522
jgoins@wvago.gov
scompton@wvago.gov
cetheredge@wvago.gov
awaight@wvago.gov