**IN THE UNITED STATES DISTRICT COURT FOR**
**THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**HUNTINGTON DIVISION**

SOLUTIONS ORIENTED ADDICTION
RESPONSE WEST VIRGINIA,

Plaintiff,

v. CIVIL ACTION NO. 3:26-0175

STATE OF WEST VIRGINIA,
PATRICK MORRISEY,
in his official capacity as Governor of West Virginia,
ARVIN SINGH,
in his official capacity as Secretary of Health,
THE WEST VIRGINIA DEPARTMENT OF HEALTH,
GORDON C. LANE, JR.,
in his official capacity as Executive Director of the
West Virginia Health Care Authority,
ROBERT CHEREN,
in his official capacity as Chairman of the West Virginia
Health Care Authority, and
THE WEST VIRGINIA HEALTH CARE AUTHORITY,

Defendants.

**MEMORANDUM OPINION AND ORDER**

Pending before the Court is a Motion to Dismiss by Defendants the State of West Virginia, Governor Patrick Morrisey, Secretary of Health Arvin Singh, the West Virginia Department of Health, the Executive Director of the West Virginia Health Care Authority Gordon C. Lane, Jr., the Chairman of the West Virginia Health Care Authority Robert Cheren, and the West Virginia Health Care Authority ("HCRA").[1] ECF No. 26. Plaintiff Solutions Oriented Addiction Response

[1] The individually named Defendants are sued only in their official capacities. All Defendants are represented by the same counsel.

West Virginia ("SOAR-WV") opposes the motion. For the following reasons, the Court **GRANTS, in part,** and **DENIES, in part,** Defendants' motion.

## I.
## BACKGROUND

On March 5, 2026, SOAR-WV filed a Complaint for Declaratory and Injunctive Relief. In its Complaint, SOAR-WV asserts it is a not-for-profit organization operating throughout West Virginia. *Compl.* ¶16. SOAR-WV claims its "mission is 'to save lives, reduce harm and stigma, and empower individuals impacted by drug use through harm reduction, advocacy, and access to life-saving resources—helping build a community rooted in care and dignity for all.'" *Id*. To accomplish its mission, SOAR-WV uses volunteers and partners to distribute naloxone to reverse opioid overdoses. *Id*. ¶17. It also connects those experiencing opioid use disorder ("OUD") with treatment and support services. *Id*.

SOAR-WV alleges its mission has been hampered by a West Virginia statute which provides for "a moratorium on the licensure of new opioid treatment programs ["OTPs"] which do not have a certificate of need ["CON"] as of the effective date of the enactment of this section during the 2016 regular session of the Legislature which shall continue until the Legislature determines that there is a necessity for additional opioid treatment programs in West Virginia." W. Va. Code § 16B-13-12. In addition, West Virginia Code § 16-2D-9(4) prevents HCRA from issuing certificates of need to any opioid treatment programs,[2] and zoning restrictions prevent

[2]There is a limited exception for a clinical trial. West Virginia Code § 16-2D-9(4) provides, in part:

> the authority may not issue a certificate of need to: . . . An opioid treatment program: *Provided*, That an opioid treatment program that is an approved clinical trial, with institutional review board approval, for the study of office-based methadone versus buprenorphine to address retention in medication for opioid use

medication-assisted treatment programs from being "located within one-half mile of a public or private licensed day care center or public or private K-12 school" unless it is an existing program and granted a variance. W. Va. Code § 16B-13-6(c). SOAR-WV claims that West Virginia is the only State that has a moratorium on establishing new methadone clinics, despite the fact it has had the highest rate of overdose deaths fourteen of the past fifteen years. *Compl.* ¶¶2, 39. In addition, SOAR-WV maintains that methadone is the only effective treatment for many who have OUD, and "[w]ithout access to methadone, individuals with the most severe addition are less likely to enter treatment and thus are at a dramatically higher risk of fatal overdose." *Id*. ¶5.

According to SOAR-WV, there currently are only nine approved treatment facilities in West Virginia, which leaves large portions of West Virginia either underserved or not served at all. *Compl.* ¶¶78-82. As a result, SOAR-WV claims it is injured in two main ways. First, it asserts "the moratorium and zoning restrictions limit [its] ability to refer the individuals it serves to effective treatment options, forcing [it] to expend resources providing services to individuals who would otherwise be receiving effective treatment and not in need of SOAR-WV's services." *Id*. ¶90. Second, SOAR-WV contends it "is forced to expend more resources in its statewide naloxone distribution efforts and is further from achieving its core organizational mission of saturating the state in naloxone because there is a larger pool of individuals who are at risk of overdose because of the moratorium and zoning restrictions." *Id*. ¶91.

---

> disorder treatment may be developed for the limited purposes of conducting the clinical trial and shall be limited to the time frame set forth in the clinical trial, after registering with the Board of Pharmacy: *Provided*, however, That this exemption only permits one program to participate once in CTN-0131[.]

W. Va. Code § 16-2D-9(4), in part.

In its "First Claim" of the Complaint, SOAR-WV asserts that those with OUDs are individuals with disabilities protected by the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12131 *et seq.*, and West Virginia's moratorium and zoning restrictions discriminates against them in violation of Title II of the Act. *Id.* ¶¶110-114. Similarly, in its "Second Claim," SOAR-WV alleges that the moratorium and zoning restriction violate Section 504 of the Rehabilitation Act, 29 U.S.C. § 794, by "discriminat[ing] against people with disabilities by regulating OTPs more strictly than health facilities that treat people with other disabilities." *Id.* ¶122. As a result of this discrimination, those with OUDs do not have adequate access to methadone treatment, which "caus[es] ongoing injury to SOAR-WV's mission by requiring it to divert its resources to counteract the harm caused by the moratorium, draining SOAR-WV of limited resources and keeping it further away from its goal of saturating the state in naloxone and reducing overdose deaths." *Id.* ¶¶115, 123. Therefore, SOAR-WV seeks a declaratory judgment that the moratorium and zoning restrictions violate the Title II of the ADA and the Rehabilitation Act, and they seek an injunction against Defendants enforcing the moratorium and zoning restrictions.

## II.
## DISCUSSION

The Declaratory Judgment Act alone does not confer this Court with jurisdiction. *See California v. Texas*, 593 U.S. 659, 672 (2021) ("The Declaratory Judgment Act, 28 U.S.C. § 2201, alone does not provide a court with jurisdiction." (Citations omitted)). Rather, it is a remedy that only can be granted where subject matter jurisdiction exists apart from it. *Skelly Oil Co. v. Phillips Petroleum Co.*, 339 U.S. 667, 671–72 (1950) ("Congress enlarged the range of remedies available in the federal courts but did not extend their jurisdiction. . . . [T]he requirements of jurisdiction—the limited subject matters which alone Congress had authorized the District Courts to adjudicate—were not impliedly repealed or modified" by the Declaratory Judgment Act. (Citations

omitted)). Thus, the Court must assure itself "that subject matter jurisdiction would lie between the parties even in the absence of the Act." *Capitol Broad. Co. v. City of Raleigh, N. Carolina*, 104 F.4th 536, 540 (4th Cir. 2024).

In their Motion to Dismiss, Defendants argue this Court does not have subject matter jurisdiction and this action should be dismissed under Rule 12(b)(1) of the Federal Rules of Civil Procedure because SOAR-WV lacks standing. In support, Defendants point out that SOAR-WV does not claim to be an opioid treatment center, does not operate any such centers, and does not claim it has ever applied for a certificate of need to open such a center. In addition, SOAR-WV does not purport to be a "qualified individual with a disability" or claim it was "excluded from participation in or . . . denied the benefits of the services, programs, or activities of a public entity, or . . . subjected to discrimination by any such entity" under the ADA. 42 U.S.C. § 12132. It also does not assert it was "subjected to discrimination under any program or activity receiving Federal financial assistance" under the Rehabilitation Act. 29 U.S.C. 794(a). Thus, Defendants argue that SOAR-WV cannot establish standing under either of the two Acts it relies upon for federal question jurisdiction.

It is a fundamental rule that a "court may not issue any decision on the merits without confirming that standing exists." *PEM Entities LLC v. Cnty. of Franklin*, 57 F.4th 178, 182 (4th Cir. 2023) (citing *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 93-95 (1998)). "Article III of the Constitution confines the jurisdiction of federal courts to 'Cases' and 'Controversies.' The case or controversy requirement limits the role of the Federal Judiciary in our system of separated powers." *Food & Drug Admin. v. All. for Hippocratic Med.*, 602 U.S. 367, 378 (2024). In practical terms, a "plaintiff cannot be a mere bystander, but instead must have a 'personal stake' in the

dispute" to get a federal judicial determination. *Id*. at 379 (quoting *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021)).

Organizations, like SOAR-WV, can demonstrate standing under Article III in two ways: "[e]ither the organization can claim that it suffered an injury in its own right [organizational standing] or, alternatively, it can assert standing solely as the representative of its members [associational standing]." *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181, 199 (2023) (internal quotation marks and citation omitted). In this case, SOAR-WV does not assert it has associational standing. Rather, it claims to have organizational standing.

To establish standing, SOAR-WV has the burden to show "(i) that [it] has suffered or likely will suffer an injury in fact, (ii) that the injury likely was caused or will be caused by the defendant, and (iii) that the injury likely would be redressed by the requested judicial relief." *All. for Hippocratic Med*., 602 U.S. at 380 (citations omitted)). At the pleading stage, as here, SOAR-WV "must clearly . . . allege facts demonstrating each element." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016) (internal quotation marks, citation, and footnote omitted; ellipsis in *Spokeo*). However, the second and third elements frequently are "'flip sides of the same coin'" because if a defendant is found to have caused an injury, injunctive relief and damages "will typically redress that injury." *All. for Hippocratic Med*., 602 U.S. at 380-81 (citation omitted)). Thus, in most cases in which standing is challenged, the questions to resolve are whether the plaintiff has an injury in fact and, if so, did the defendant cause that injury. *Id*. In resolving these questions under Rule 12(b)(1) motion, the Court must "assume the truthfulness of the facts alleged" in deciding whether SOAR-WV has met its burden. *Kerns v. United States*, 585 F.3d 187, 193 (4th Cir. 2009).

To prove "an injury in fact," a plaintiff must have a "concrete" (real) injury. *All. for Hippocratic Med.*, 602 U.S. at 381 (citation omitted). In addition, the injury "must be particularized," meaning it "must affect 'the plaintiff in a personal and individual way' and not be a generalized grievance." *Id.* (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 n.1 (1992)). Examples of a real injury include "physical injury, a monetary injury, an injury to one's property, or an injury to one's constitutional rights[.]" *Id.* For it to be "an injury in fact," it also "must be actual or imminent, not speculative—meaning that the injury must have already occurred or be likely to occur soon. And when a plaintiff seeks prospective relief such as an injunction, the plaintiff must establish a sufficient likelihood of future injury." *Id.* (citation omitted).

The purpose of requiring a plaintiff to demonstrate "an injury in fact" is to "screen[] out plaintiffs who might have only a general legal, moral, ideological, or policy objection to a particular government action. For example, a citizen does not have standing to challenge a government regulation simply because the plaintiff believes that the government is acting illegally." *Id.* (citation omitted). When bystanders simply feel that their values are aggrieved, they should turn to the Legislative and Executive branches of Government to vindicate those rights, not the Judicial branch. *Id.* The same rules apply to organizations that claim injuries. "[A]n organization may not establish standing simply based on the 'intensity of the litigant's interest' or because of strong opposition to the government's conduct, 'no matter how longstanding the interest and no matter how qualified the organization.'" *Id.* at 394 (quoting *Valley Forge Christian Coll. v. Americans United for Separation of Church & State, Inc.*, 454 U.S. 464, 486 (1982); *Sierra Club v. Morton*, 405 U.S. 727, 739 (1972)). An organization's objection to a government action, by itself, is not enough to establish standing. *Id.*

In this case, SOAR-WV argues that it is directly harmed by the unlawful moratorium and zoning restrictions and that harm will be resolved after the moratorium and zoning restrictions are invalidated. Although admittedly not a "qualified individual with a disability" under the ADA,[3] SOAR-WV claims it does not matter as the Fourth Circuit recognized in *A Helping Hand, LLC v. Baltimore Cty., MD*, 515 F.3d 356 (4th Cir. 2008), that Title II of the ADA provides a remedy to "any person" alleging disability discrimination even if they themselves are not disabled. 515 F.3d at 364 (finding "every circuit that has considered whether a methadone clinic has standing under Title II of the ADA to bring a claim based on injuries resulting from its association with the addicted persons it serves has found that the clinic does have standing" (citations omitted)); *see also* 28 C.F.R. § 35.130(g) (providing "[a] public entity shall not exclude or otherwise deny equal services, programs, or activities to an individual or entity because of the known disability of an individual with whom the individual or entity is known to have a relationship or association").

Additionally, SOAR-WV argues that this case is similar to the Supreme Court's landmark decision in *Havens Reality Corp. v. Coleman*, 455 U.S. 363 (1982). In *Havens*, a non-profit corporation whose mission "was 'to make equal opportunity in housing a reality'" brought an action, with others, against an apartment complex that allegedly engaged in unlawful racial steering practices. *Id*. at 368, 379. (citation omitted). The organization alleged it "ha[d] been frustrated by defendants' racial steering practices in its efforts to assist equal access to housing through counseling and other referral services" and, consequently, it had "devote[d] significant resources to identify and counteract the . . . racially discriminatory steering practices." *Id*. at 379 (internal quotation marks omitted). The Supreme Court found that if these steering practices, as broadly alleged, "perceptibly impaired [the organization's] ability to provide counseling and

[3] 42 U.S.C. § 12132.

referral services for low- and moderate-income homeseekers, there [could] be no question that the organization [had] suffered injury in fact." *Id*. As the Supreme Court explained, "[s]uch concrete and demonstrable injury to the organization's activities—with consequent drain on the organization's resources—constitutes far more than simply a setback to the organization's abstract social interests." *Id*. (citation omitted). Thus, the Supreme Court concluded that the organization had standing in its own right. *Id.* (footnote omitted). *See also Republican Nat'l Comm. v. N. Carolina State Bd. of Elections*, 120 F.4th 390, 397 (4th Cir. 2024) (finding the plaintiffs' allegations of organizational injury were sufficient under Article III based on its assertion that the defendant's failure to fight voter fraud caused them to divert resources from its core mission "to counsel voters to support Republican candidates"); *People for Ethical Treatment of Animals, Inc. v. Tri-State Zoological Park of W. Maryland, Inc*., 843 F. App'x 493, 496 (4th Cir. 2021) (deciding that PETA's allegations that it was necessary for it to investigate, monitor, and report the defendants' treatment of certain animals under the Endangered Species Act and that such actions diverted its resources to carry out its mission to "engage in mission-related campaigns against other zoos" were sufficient to meet the standing standard set forth in *Havens Realty*); *compare with D.C. by Chaplick v. Fairfax Cty. Sch. Bd.,* 171 F.4th 255, 266-67 (4th Cir. 2026) (finding no concrete organizational injury for purposes of standing when the organization used its resources "to do the very thing it was formed to do" (internal quotation marks and citation omitted)).

As in *Havens*, SOAR-WV alleges the moratorium and zoning restrictions directly interfere with its core business activities and it is not simply a setback to its abstract social interests. To the contrary, Defendants argue SOAR-WV cannot prove "an injury in fact" because it made an independent and voluntary decision to expend its resources and money in a particular way, and it is well established that SOAR-WV cannot "spend its way into standing." *All. for Hippocratic*

*Med.*, 602 U.S. 394. However, the Court finds the allegations in this case do not support Defendants' argument.

Here, SOAR-WV alleges there is a shortage of methadone clinics in West Virginia because of the moratorium and zoning regulations. Consequently, SOAR-WV asserts there is a larger pool of individuals in need of its services and who are at risk of overdose because they are unable to receive effective methadone treatment. As a result, SOAR-WV claims it referral services are directly impacted by the lack of methadone clinics, and it is forced to expend more of its resources providing help to those who are unable to receive effective methadone treatment. It also claims it is spending more money on distributing naloxone to prevent overdose deaths. SOAR-WV maintains this constant drain of its resources prevents it "from achieving its core organizational mission of saturating the state in naloxone." *Compl.* ¶91. In considering these allegations, the Court has no difficulty finding SOAR-WV has sufficiently alleged it has suffered a concrete and demonstrable injury that has perceptibly impaired its core mission, which goes beyond an abstract social interest. Therefore, the Court finds SOAR-WV has satisfied the injury in fact element for standing under Article III.

Turning next to the causation element, a plaintiff must show that its "injury likely was caused or likely will be caused by the defendant's conduct." *All. for Hippocratic Med.*, 602 U.S. at 382. "[W]hen (as here) a plaintiff challenges the government's unlawful regulation . . . of *someone else*, standing is not precluded, but it is ordinarily substantially more difficult to establish." *Id.* (italics original; internal quotation marks and citations omitted). To show causation in these circumstances, a plaintiff must do more than speculate about what an independent, non-party to the action may do. Rather, "the plaintiff must show that the third parties will likely react in predictable ways that in turn will likely injure the plaintiffs." *Id.* (internal quotation marks and

citations omitted). Whether the plaintiff can make such a showing often is difficult and heavily fact dependent, but reliance on similar cases has proved helpful. *Id.* at 384. Fundamentally, a plaintiff "must show a predictable chain of events leading from the government action to the asserted injury—in other words, that the government action has caused or likely will cause injury in fact to the plaintiff." *Id*. at 385 (footnote omitted).

SOAR-WV argues that, but for the moratorium and zoning restrictions, additional opioid treatment programs would open across West Virginia, which would provide it with a broader network to make referrals and reduce the mortality rate of those with opioid use disorder who receive methadone treatment.[4] However, Defendants argue the fact SOAR-WV wants more options to connect opioid users with treatment centers will have, at best, only an indirect impact on its mission of saturating West Virginia with naloxone. The Court disagrees with Defendants' position based on the allegations.

It is simple common sense that, if SOAR-WV is spending more money on naloxone that is being depleted by opioid users who are unable to receive effective methadone treatment and are using the naloxone they are given—which then must be replenished, it obviously will have less money to spend on "saturating" West Virginia with naloxone. Moreover, as SOAR-WV has alleged the lack of methadone treatment centers has made it more difficult and time consuming to connect individual users to treatment, it necessarily follows that it is spending more of its resources on each individual referral. Therefore, the Court has little difficulty finding that SOAR-WV has

[4] SOAR-WV states that evidence shows those with opioid use disorder who receive methadone treatment have a mortality rate less than half of those not in treatment. *Compl.* ¶61.

sufficiently alleged a direct connection between the moratorium and zoning restrictions and injury to its mission.[5]

Nevertheless, Defendants also argue that SOAR-WV has failed to show they individually have caused or could have caused its alleged injuries. Defendants assert the Complaint "is silent about what role (if any) the individual defendants have in the moratorium and zoning restrictions, much less that any such defendant had a *specific duty* to enforce them . . . . [or] may be held liable." *Defs.' Reply in Supp. of Mot. to Dis.*, at 10, ECF No. 31 (italics original). Instead, Defendants contend that the SOAR-WV merely identifies them in the Complaint and provides a summary of what Plaintiff believes to be Defendants' respective roles, which is not enough for standing.

Although the Court has found a connection between the moratorium and zoning restrictions and injury to SOAR-WV's mission, SOAR-WV cannot "conjure the power of the federal courts to sue whomever they please" when it believes there are statutory violations. *Rouse v. Fader*, 171 F.4th 272, 285 (4th Cir. 2026). "[T]he standing inquiry must be evaluated separately as to each defendant" and an individual defendant "must have 'a specific duty to enforce'" the law being challenged. *Disability Rights S.C. v. McMaster*, 24 F.4th 893, 900, 901 (4th Cir. 2022) (citations omitted). "When a defendant has no role in enforcing the law at issue, it follows that the plaintiff's injury allegedly caused by that law is not traceable to the defendant." *Id*. at 902.

In its Response, SOAR-WV does little to identify how each individual Defendant is subject to suit. Instead, SOAR-WV just generally states each Defendant is properly sued because they are charged with enforcing the moratorium and zoning restrictions and, if lifted, "these Defendants

---

[5]As SOAR-WV was formed after the moratorium and zoning restrictions were enacted, Defendants assert it knew the regulatory environment from the start and cannot now claim it was injured. However, Plaintiff alleges the number of opioid users and the potency of those drugs have not remained stagnant and have increased over the years, making its mission more difficult. Moreover, a plaintiff can still be injured by illegal restrictions that predate its existence.

would have the power to issue certificates of need to OTPs, and thus allow them to open," making the "injury traceable to Defendants' illegal conduct." *Pl.'s Mem. in Opp. to Defs.' Mot. to Dismiss*, at 14, ECF No. 28.

However, aside from Defendant Lane, as the Executive Director of HRCRA, and Defendant Cheren, as the Chairman of HCRA, Defendants assert none of the other named Defendants have any specific duty to enforce the moratorium and zoning restrictions. *Defs.' Mem. in Supp. of Mot. to Dismiss*, at 15, ECF No. 27 ("Plaintiff does not identify what role the individual defendants even have in the CON process, much less that any such defendant has *a specific duty to enforce* the moratorium and zoning restrictions; and to be clear, aside from the Chairman and Director, they have none whatsoever."). Additionally, Defendants maintain SOAR-WV has failed to identify any actions that any of them actually took to cause them injury. Therefore, Defendants insist they all should be dismissed.

To the contrary, SOAR-WV argues Defendants can be sued despite the fact they cannot legally issue certificates of need because they are the individuals charged with enforcing the moratorium and zoning restrictions. If the moratorium and zoning restrictions are declared unenforceable, SOAR-WV contends Defendants could issue the certificate of need and opioid treatment programs will open.

In support of its position, SOAR-WV cites *Bostic v. Schaefer*, 760 F.3d 352 (4th Cir. 2014). In *Bostic*, two same-sex couples sued because Virginia refused to allow same-sex marriages and failed to recognize same-sex marriages that occurred elsewhere. 760 F.3d at 367. In considering whether there was standing to sue Virginia's Registrar of Vital Records, the Fourth Circuit recognized that the couple denied a marriage license had standing against the Registrar because of her role in promulgating "marriage license application form[s] that [did] not allow same-sex

couples to obtain marriage licenses" in compliance with Virginia law. *Id*. at 372. The Fourth Circuit held the couple who was denied a license suffered an injury that was traceable to the Registrar and the relief they sought would redress their injuries, giving them standing to sue the Registrar. *Id*.

Under *Bostic*, this Court agrees with SOAR-WV that it has standing against Defendant Lane, as the Executive Director of HRCRA, and Defendant Cheren, as the Chairman of HCRA. In the Complaint, SOAR-WV alleges that both of these Defendants are "prohibited from issuing certificates of need to OTPs." *Compl.* ¶¶25, 26. Additionally, the Complaint alleges that Defendant HCRA "is responsible for issuing certificates of need to health care entities in West Virginia," but it cannot under West Virginia law. *Id*. ¶27. As to these three Defendants, enjoining the enforcement of the moratorium and zoning regulations would allow them to issue certificates of need. However, as stated above, this Court must consider standing as to each Defendant individually, and the Court finds that SOAR-WV does not have standing as to the remaining Defendants.

Starting with Governor Morrisey, the Court is guided by the Fourth Circuit's decision in *Rouse*. In that case, the plaintiffs named the Governor of Maryland as a defendant asserting he "is charged with enforcement of Maryland's Uniform Enforcement of Foreign Judgment Act." *Rouse*, 171 F.4th at 283. The Fourth Circuit held that this allegation "merely recognizes the Governor's general executive authority" and said that the "[p]laintiffs have not explained—and cannot explain—how anything the Governor did or did not do relates to the . . . allegedly unlawful conduct" of state-court clerks who domesticated certain dubious out-of-state judgments. *Id*. at 276, 283. Thus, there was no evidence connecting the alleged injury to the Governor. *Id.*[6]; *see also*

[6]The Fourth Circuit also held that the plaintiffs lacked standing to sue the Justices of the Supreme Court of Maryland because the plaintiffs did not show that the Justices' "failure to promulgate a rule or otherwise act to require compliance with the Relief Act's procedural

*McMaster*, 24 F.4th at 902 (finding the Governor lacked a specific duty to enforce the state law at issue and, therefore, "it follows that the plaintiff's injury allegedly caused by that law is not traceable to" him); *Sheppheard v. Morrisey*, 143 F.4th 232, 243, 244 (4th Cir. 2025) (holding the appellants' complaints about prison conditions were not traceable to the Governor).

Likewise, the Complaint in this case does not explain any *specific duty* Governor Morrisey has in enforcing the moratorium and zoning restrictions. Instead, SOAR-WV alleges Governor Morrisey is statutorily "'responsible for planning and development of the State's governmental, social, health, economic, environmental and physical resources.'" *Id*. ¶22 (quoting W. Va. Code § 8-25-3, in part). This allegation is the exact type of general executive authority that the Fourth Circuit found in *Rouse* was insufficient to establish standing. Thus, SOAR-WV has not alleged its injury is traceable to Governor Morrisey.[7]

The same is true of the West Virginia Department of Health, Secretary of Health Singh, and the State of West Virginia. In the Complaint, SOAR-WV alleges HCRA is a component of the Department of Health, Defendant Singh oversees HRCRA, and the State of West Virginia is responsible for enforcing the ADA and complying with Section 504. *Id.* ¶¶21, 23, 24. As with Governor Morrisey, SOAR-WV's allegations with respect to these Defendants merely describe their general authority. It does not identify any specific duty they have to enforce the moratorium

protections" "had a determinative or coercive effect on the clerks' conduct, or made the clerks' conduct predictable." *Id*. at 281, 282 (footnote omitted).

[7]The Court recognizes that the Governor of Virginia was named as a defendant in *Bostic*, but it appears that the Governor did not challenge standing. Thus, the Fourth Circuit did not consider the issue. Since *Bostic* was decided, the Fourth Circuit has made it clear in *Rouse*, *McMaster*, and *Sheppheard* that allegations of a Governor's general executive authority is insufficient to establish standing.

or zoning restrictions or issue a certificate of need. Therefore, Plaintiff's allegations are insufficient to demonstrate standing against these Defendants.

Defendants further contend that SOAR-WV cannot establish the third element of standing because it is speculative that its injury will be redressed by a favorable decision. In the Complaint, SOAR-WV alleges that "[i]f the moratorium and zoning restrictions were lifted, more OTPs would open across the state of West Virginia, and OTPs would have an easier time finding appropriate locations to operate." *Id*. ¶87. Defendants argue the Court has no authority to require a third party to apply for a certificate of need and it has no jurisdiction to determine if any application should be approved. Thus, Defendants assert that lifting the moratorium and zoning restrictions will not ensure that "more OTPs would open across the state," as alleged by SOAR-WV. Rather, redressability hinges on how a third party will react to the ruling and, if a third party decides to apply for a certificate of need, whether the application otherwise meets the standards for approval. If approved, the third party would then have to actually open a facility that offers methadone treatment. Defendants state that, at this point in time, there is no allegation a third party has ever even attempted to get a certificate of need. Therefore, Defendants insist a ruling in favor of SOAR-WV will not redress its alleged injury.

As mentioned earlier, redressability requires the Court to determine that "it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Sierra Club v. United States Dep't of the Interior*, 899 F.3d 260, 284 (4th Cir. 2018) (internal quotation marks and citations omitted). Here, SOAR-WV alleges the number of methadone clinics in the United States has nearly doubled since 2011. *See Compl.* ¶77 (providing there were 1,189 methadone clinics in 2011 and over 2,100 in 2026). Yet, West Virginia continues to have only nine clinics due to the moratorium and zoning restrictions. SOAR-WV claims this number is woefully

inadequate for several reasons: the increased the potency of street drugs over the past several years; recent statistics indicate in 2024 some 45,000 individuals in West Virginia had an opioid use disorder, but only 2,123 were receiving methadone treatment; there are large portions of the State without any access or, at most, limited access to a methadone clinic; and the State's opioid overdose death rate in 2024 was double the national average. *Id.* ¶¶44-49, 79, 80-84, 40. Given these circumstances and the fact clinics have opened throughout the country in response to demand, SOAR-WV asserts it is beyond speculative—indeed it is predictable—that third-party methadone treatment providers will apply for certificates of need to open methadone clinics in the State, with methadone being the only full agonist medication for opioid use disorder to treat patients. *Id.* ¶¶ 52, 79, 87. The Court agrees.

SOAR-WV's allegations characterize a significant need for methadone treatment in West Virginia. Assuming the truth of those allegations and the capitalistic economic realities of an underserved market, it is certainly likely that methadone providers will apply and fulfill the requirements necessary to receive certificates of need to establish facilities that offer methadone treatment. It also is likely that any provider completing the certificate of need process will proceed to establish a clinic, which, for purposes of standing, will redress SOAR-WV's allegation that the lack of clinics drains its resources and injures its core mission. *See Diamond Alt. Energy, LLC v.* EPA, 606 U.S. 100, 117, 121 (2025) ("After all, the fact that a regulation was designed to produce a particular effect on the market ordinarily means that the likely result of vacating that regulation would be to reduce that effect on the market." Moreover, "to show redressability, the plaintiff must simply show a predictable chain of events that would likely result from judicial relief and redress the plaintiff's injury." (Internal quotation marks and citations omitted)). Therefore, the Court finds SOAR-WV meets the redressability standard for standing.

## III.
## CONCLUSION

Accordingly, for the foregoing reasons, the Court finds that Plaintiff's allegations are sufficient to demonstrate standing against Defendant Lane, as the Executive Director of HRCRA, Defendant Cheren, as the Chairman of HCRA, and HCRA itself. Therefore, the Court **DENIES** Defendants' motion as to these Defendants. However, the Court finds Plaintiff's allegations are insufficient to establish standing against Defendants Morrisey, Secretary of Health Singh, the West Virginia Department of Health, and the State of West Virginia. Thus, the Court **GRANTS** Defendant's motion with respect to these Defendants and **DISMISSES** them from this action.

The Court **DIRECTS** the Clerk to send a copy of this Order to counsel of record and any unrepresented parties.

ENTER: August 14, 2026

ROBERT C. CHAMBERS
UNITED STATES DISTRICT JUDGE