**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**
**HUNTINGTON DIVISION**

**SOLUTIONS ORIENTED ADDICTION RESPONSE WEST VIRGINIA,**

**Plaintiff,**

**v.**

**Case No. 3:26-cv-00175**
**Hon. Robert C. Chambers**

**STATE OF WEST VIRGINIA, *et al*.,**

**Defendants.**

# DEFENDANTS' MEMORANDUM IN SUPPORT OF RENEWED MOTION FOR JUDGMENT ON THE PLEADINGS

The West Virginia Health Care Authority (HCA), the Office of Health Facility Licensure and Certification (OHFLAC), and their respective officers, HCA Chairman Robert Cheren and Executive Director Gordon Lane, and OHFLAC Director Mary Argento (collectively Defendants), submit this memorandum in support of their Renewed Motion for Judgment on the Pleadings.[1] (ECF 49). For the reasons outlined below, Plaintiff has failed to state any claim upon which relief can be granted, so its claims should be dismissed.

## INTRODUCTION & BACKGROUND

The opioid crisis is one of the defining public policy challenges of our time. A problem of this magnitude is not amenable to silver-bullet solutions. It has taken,

[1] HCA and its officers previously filed a Motion for Judgment on the Pleadings. *See* (ECF 40, 41). Shortly thereafter, SOAR sought leave to file its First Amended Complaint, primarily to add OHFLAC as a party. (ECF 44). The Court granted SOAR's request, rendering HCA's motion moot. (ECF 45). Due to that mootness, the Court denied HCA's motion without prejudice. *Id*

and will continue to take, an across-the-board effort to repair the damage the crisis has already done in West Virginia and mitigate its impact going forward. Efforts to help those affected—including the efforts of organizations like plaintiff Solutions Oriented Addiction Response West Virginia (SOAR)—are laudable. But even the best of intentions do not grant SOAR (or anyone else) a shortcut past the normal legislative process or allow them to bypass the jurisdictional and statutory requirements that govern access to federal judicial relief.

Reasonable people can and will disagree about which policies are best calibrated to combat the opioid epidemic. In the mid-2000s,[2] against the backdrop of an alarming rise in "methadone-associated mortality,"[3] the West Virginia Legislature enacted a moratorium on the establishment of new methadone-dispensing opioid treatment programs in West Virginia. The wisdom of the moratorium's continued existence is not for this Court to decide; the appropriate forum for that conversation is under the Golden Dome in Charleston. The question here is much narrower: Whether maintenance of the moratorium (in particular, Section 16-2D-9's certificate

---

[2] As outlined below, *see* p. 7 & n.7, *infra*, although the current durable moratorium traces its substantive roots to 2007, the Legislature first turned its attention to methadone in 2004 when it enacted a temporary moratorium pausing the licensure of new clinics until West Virginia's Department of Health and Human Resources could "promulgate emergency rules" regulating methadone-dispensing opioid treatment programs. H.B. 2755, 76th Leg., Reg. Sess. (2004).

[3] *See*, *e.g.*, *Methadone-Associated Mortality: Report of a National Assessment*, U.S. Dep't. of Health and Human Services, Substance Abuse and Mental Health Services Administration, SAMHSA Publication No. 04-3904 (2004), https://perma.cc/GN3N-NV7P. As that SAMHSA report indicates, in the early 2000s "[d]iversion, abuse, and deaths associated with many opioid medications, including methadone" were "front-page news." *Id.* at 8. Articles appearing in major newspapers described methadone as a "killer drug" and described it as being "widely abused and dangerous." *Id.*

of need restriction and Section 16B-13-12's licensure restriction) and a related regulatory provision (Section 16B-13-6(c)'s siting/zoning restriction) are compatible with the Americans with Disabilities Act (ADA) or the Rehabilitation Act (RA).

SOAR insists that this Court must invalidate West Virginia's two-decades-old body of law, but multiple obstacles stand between SOAR and that request for sweeping relief. To be sure, this Court has already concluded that SOAR alleged an injury sufficient to establish standing. *See* Memorandum Opinion and Order Granting in Part, Denying in Part Motion to Dismiss (ECF 33). But an assessment of standing is distinct from an evaluation of the merits. *See S.C. State Conf. of the NAACP v. Weaver*, 181 F.4th 353, 373 (4th Cir. 2026). And on the *merits* (or otherwise at the threshold), SOAR has problems with timeliness, the lack of a viable cause of action, the absence of discrimination against SOAR itself, and ripeness. In sum, SOAR is the wrong plaintiff, it has made unwarranted, speculative assumptions about the impact its requested relief would have, and it both waited too long to seek redress (overall) and acted prematurely (in its challenge to the zoning restriction).

Because these legal impediments are fatal to SOAR's claims, the Court should grant Defendants'[4] motion and dismiss this action.

**GOVERNING STANDARD**

A "motion for judgment on the pleadings is reviewed under the same standard as a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure."

[4] SOAR originally filed suit against numerous West Virginia entities and officials, but this Court dismissed the claims against everyone initially sued except for HCA and its officers, Chairman Cheren and Executive Director Lane. *See* (ECF 33). SOAR has since amended its complaint to add OHFLAC and its director. *See* n.1, *supra*.

*Mission Coal Wind Down Co., LLC v. Nat'l Union Fire Ins. Co. of Pittsburgh*, 2021 WL 431466, at *2 (S.D.W. Va. Feb. 8, 2021). Rule 12(h) expressly permits the defense of "failure to state a claim to be raised in a 12(c) motion for judgment on the pleadings." *Watkins v. Wells Fargo Bank*, 2011 WL 777895, at *3 (S.D.W. Va. Feb. 28, 2011). And the absence of jurisdiction can be raised "at any time." *See Lovern v. Edwards*, 190 F.3d 648, 654 (4th Cir. 1999); *see also* Fed. R. Civ. P. 12(h)(3) ("If the court determines at any time that it lacks subject-matter jurisdiction, the court must dismiss the action.").

To survive a motion to dismiss, a complaint must "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A complaint may fail to state a claim upon which relief can be granted in two ways: first, by failing to state a valid legal cause of action, *i.e.*, a cognizable claim; or second, by failing to allege sufficient facts to support a legal cause of action." *Darling v. Falls*, 236 F. Supp. 3d 914, 920 (M.D.N.C. 2017) (internal citations omitted).

Facial plausibility requires the complaint to contain allegations that allow a reviewing court to "draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Courts considering a motion to dismiss must accept well-plead factual allegations as true but "are not bound to accept as true … legal conclusion[s] couched as … factual allegation[s]." *Twombly*, 550 U.S. at 555. Only when a plaintiff has "articulate[d] facts … that show [he] has stated a claim entitling him to relief" has the plausibility threshold been

surpassed. *Francis v. Giacomelli*, 588 F.3d 186, 193 (4th Cir. 2009) (internal citations and quotation marks omitted).

## ARGUMENT

### I. SOAR's claims are barred by the applicable two-year statute of limitations.

**A.** Although neither the ADA nor RA contains a statute of limitations, it is "settled practice" for federal courts to "adopt a local time limitation" when "Congress has not established a time limitation for a federal cause of action." *Wilson v. Garcia*, 471 U.S. 261, 266 (1985).[5] Thus, when considering an ADA or RA claim, federal courts "borrow the state statute of limitations that applies to the most analogous state-law claim." *A Soc'y Without A Name v. Virginia*, 655 F.3d 342, 347 (4th Cir. 2011); *see also Timpson by & through Timpson v. Anderson Cnty. Disabilities & Special Needs Bd.*, 31 F.4th 238, 249 (4th Cir. 2022) (confirming that both the ADA and RA borrow the analogous state law limitations period).

The West Virginia statute most analogous to both the ADA and the RA is the West Virginia Human Rights Act (WVHRA). *See* W. Va. Code § 16B-17-1 *et seq*. Like its federal counterparts, the WVHRA is designed to ensure that individuals have "equal access to places of public accommodation[] … without regard to," among other things, "disability." W. Va. Code § 16B-17-2. And the WVHRA expressly prohibits

[5] Congress has enacted a "catchall" four-year limitations period for federal statutes enacted after December 1, 1990. 28 U.S.C. § 1658; *see Jones v. R.R. Donnelley & Sons Co.*, 541 U.S. 369 (2004). However, because both the ADA and RA were originally enacted before December 1, 1990—and the claims here do not arise under any post-December 1990 amendment to either statute—Section 1658 does not apply. *Without A Name*, 655 F.3d at 347.

and provides a cause of action to remedy disability discrimination. W. Va. Code §§ 16B-17-9, 16B-17-13. Given that the WVHRA "provides substantially the same rights and remedies," *Timpson*, 31 F.4th at 249, as the ADA and RA, it provides the limitation period applicable to federal cases alleging disability discrimination in West Virginia. *See Mowery v. Logan Cnty. Bd. of Educ.,* 2012 WL 895921, at *2 (S.D.W. Va. Mar. 15, 2012) ("As to both Plaintiff's RA and ADA claims, the most analogous West Virginia statute is the WVHRA."); *see also Brown v. Belt*, 2019 WL 1302627, at *5 (S.D.W. Va. Mar. 21, 2019); *Roe v. Cnty. Comm'n of Monongalia Cnty.*, 926 F. Supp. 74, 78 (N.D.W. Va. 1996).

Claims arising under the WVHRA are subject to the two-year statute of limitations established by W. Va. Code § 55-2-12. *McCourt v. Oneida Coal Co.*, 188 W. Va. 647, 651, 425 S.E.2d 602, 606 (1992); *see also Turley v. Union Carbide Corp.*, 618 F. Supp. 1438, 1440–41 (S.D.W. Va. 1985). Concomitantly, the "statute of limitations for" a West Virginia plaintiff pursuing "RA and ADA claims" in federal court "is also two years." *Mowery*, 2012 WL 895921, at *2.

**B.** SOAR has not brought its ADA and RA claims within the applicable two-year limitations period.[6] A limitation period "begins to run once a claim accrues."

---

[6] Although it is an affirmative defense, a statute of limitations argument "may be raised" at the motion to dismiss stage (or in the equivalent posture of a Rule 12(c) motion) where, as here, "the time bar is apparent on the face of the complaint." *Dean v. Pilgrim's Pride Corp.*, 395 F.3d 471, 474 (4th Cir. 2005). As alleged in the Amended Complaint, SOAR "began operations in 2020." (ECF 46) at ¶ 12. And because it is the mere existence of the methadone moratorium (which predates SOAR's founding, *see* n. 2 *supra*) that is alleged to have caused the excess expenditures that constitute SOAR's injury, *see* (ECF 46) at ¶ 89; *see also* (ECF 33) at 10, SOAR's injury began as soon as it began operating in 2020 (or shortly thereafter). It is therefore apparent on the face of the operative pleading that the gravamen of SOAR's alleged harm occurred *before* March 5, 2024. As discussed in greater detail below,

*Without A Name*, 655 F.3d at 348. And a claim accrues "when the plaintiff knows or has reason to know of the injury which is the basis of the action." *Id.* (quotation marks omitted).

SOAR had reason to know of the injury that is the basis of this action long before it filed suit. The ostensible cause of SOAR's injury is West Virginia's enactment of a moratorium precluding the issuance of certificates of need for new methadone clinics. *See* First Amend. Compl. (ECF 46) at ¶¶ 4, 12, 73, 86–89, 113, 121; *see also* Response in Opposition to Motion to Dismiss (ECF 28) at 4–5 (explaining that "because of the moratorium … SOAR is forced to expend additional resources"). That moratorium is not new; it was first enacted in its present form by the West Virginia Legislature in 2007. *See* S.B. 447, 78th Leg., Reg. Sess. (2007).[7] That does

---

because SOAR did not file its lawsuit until March 5, 2026, the applicable two-year limitations period had fully run before this case was initiated.

[7] As noted above, while the durable moratorium came into existence in 2007, an emergency incarnation can be traced to 2004. *See* n.2, *supra*. Since 2007, the Legislature has revisited and tweaked the moratorium on several occasions. *See*, *e.g.*, S.B. 437, 80th Leg., Reg. Sess. (2012); H.B. 4365, 82d Leg., Reg. Sess. (2016). In 2016, for example, the Legislature reset the "grandfather" date for existing clinics. S.B. 454, 82d Leg., Reg. Sess. (2016).

In recent years, bills that would have ended the certificate of need aspect of the moratorium, the licensure aspect, or both, have been repeatedly introduced. *See*, *e.g.*, H.B. 5181, 87th Leg., Reg. Sess. (2026); H.B. 5618, 87th Leg., Reg. Sess. (2026); H.B. 3250, 87th Leg., Reg. Sess. (2025); H.B. 4750, 86th Leg., Reg. Sess. (2024); H.B. 2419, 86th Leg., Reg. Sess. (2023); H.B. 2196, 86th Leg., Reg. Sess. (2023); H.B. 4573, 85th Leg., Reg. Sess. (2022); H.B. 4607, 85th Leg., Reg. Sess. (W. Va. 2022). All have failed. As have efforts to repeal West Virginia's certificate of need regulatory architecture in its entirety. *See*, *e.g.*, Caity Coyne, *House Health votes 13-12 against bill to repeal Certificate of Need in WV*, West Virginia Watch (Feb. 24, 2025), https://perma.cc/3VXV-8BB8.

On the other hand, a proposal that would have outlawed the distribution of methadone failed to make it out of legislative committee. *See* S.B. 295, 86th Leg., Reg. Sess. (2024). Thus, the only significant substantive change the Legislature has made in the last decade is the establishment of an exception to the moratorium for a single new opioid treatment program involved in an "approved clinical trial." *See* S.B. 2028, 86th Leg., 2d Extraordinary Sess. (2024) *codified at* W. Va. Code § 16-2D-9(4).

not mean SOAR needed to sue by 2009; after all, SOAR as an organization did not even exist until 2020. *See* (ECF 46) at ¶ 12 (SOAR "began operations in 2020"). Nevertheless, the alleged harm that lies at the heart of SOAR's complaint—the "drain on [its] resources," (ECF 33) at 10—began long before it filed this lawsuit in March of 2026. As alleged in its amended complaint, SOAR began operating in 2020 and has been actively engaged in its harm reduction mission for "years." (ECF 46) at ¶¶ 12, 101. It is therefore apparent on the face of SOAR's amended complaint that the resource expenditures that are the gravamen of this lawsuit began *prior* to March 5, 2024. When those expenditures began, SOAR's cause of action accrued and the limitations clock began to tick. Accordingly, by the time SOAR filed suit—on March 5, 2026—more than two years had passed since its cause of action accrued, which means the limitations period had expired.

**C.** It does not matter that SOAR claims to be suffering an ongoing harm that it attributes to the existence of the moratorium. *See* (ECF 46) at ¶ 113. "A continuing violation is occasioned by continual unlawful acts, not continual ill effects from an original violation." *Nat'l Advert. Co. v. City of Raleigh*, 947 F.2d 1158, 1166 (4th Cir. 1991) (quotation omitted). This is not a situation where the alleged unlawful action is a "series of separate" repetitive acts. *Id.* at 1167 (quotation omitted). SOAR claims to be aggrieved by the enactment of the moratorium[8] writ large, not particular instances in which the moratorium or one of its provisions was specifically enforced against it. In the absence of such discrete instances of enforcement, which would

[8] And related regulatory provisions, including what SOAR calls the "zoning restriction." *See* Sect. IV, *infra*.

cause "the limitations period [to] begin[] anew with each violation," there is no continuing violation and the limitation period is measured from the initial accrual of the cause of action. *Id.*

*Without a Name* provides a useful illustration. There, an advocacy organization (ASWAN) made up of homeless and formerly homeless individuals sued the Commonwealth of Virginia on a variety of grounds, including the ADA, over the relocation of a government facility (the Conrad Center) that provided services to Richmond's "downtown" homeless community. 655 F.3d at 344. ASWAN claimed that the relocation was designed to "segregate" the homeless community from the "downtown area," make the homeless "less visible," and alleged hardships, such as the difficulty in travelling to the now-distant Conrad Center that they claimed were "root[ed] in … disability prejudice." *Id.* at 345.

The applicable two-year statute of limitations period, however, was an impediment to ASWAN's ADA claim. The Conrad Center began operating at its new remote, non-downtown location on February 5, 2007. *Id.* at 348. But ASWAN didn't file suit until February 17, 2009—more than two years later. *Id.* ASWAN attempted to avoid application of the time bar by arguing that the Commonwealth had engaged in a "continuing violation of the ADA." *Id.* After all, the Conrad Center had continually operated during that two-year period and the hardships alleged, such as the travel difficulties, continued unabated. *Id.*

The Fourth Circuit squarely rejected that argument. That "the Conrad Center [wa]s still located [in a remote, non-downtown location] and continue[d] to offer

services to the homeless—including new services that are added from time to time—does not amount to a continuing violation, but rather amounts to the continuing effect of the original decision to locate the Conrad Center" in that remote location. *Id.*

The same principle controls here. SOAR's alleged injury is the expenditure of resources that, but for the moratorium, it would not need to expend. That is best understood to be a "continual ill effect[]" flowing from the putative "original violation"—the enactment of the moratorium. *City of Raleigh*, 947 F.2d at 1166. SOAR is not the operator of a methadone clinic or an applicant for a certificate of need or a license; it cannot, therefore, point to a particular regulatory action taken by HCA or OHFLAC since March of 2024 that would give rise to an ADA or RA claim within the applicable two-year limitations period.

To be clear, this does not mean that West Virginia's methadone moratorium is forever shielded from future lawsuits by the passage of time. The right plaintiff—perhaps the prospective operator of a new methadone clinic who sought a certificate of need or applied for a license and was rejected because of the moratorium—could likely bring a colorable challenge. That is because the "*continued enforcement* of an [allegedly unlawful] statute cannot be insulated by [a] statute of limitations." *City of Raleigh*, 947 F.2d at 1167 (emphasis in original). And SOAR would not face a timeliness problem if it had brought its current suit within two years of the start of the expenditures that constitute its alleged harm. Unfortunately for SOAR, it has slept on its rights. Because the two-year window to pursue this case has long since expired, SOAR has failed to state a claim for which relief can be granted.

## II. SOAR's denial-of-benefits theory mischaracterizes the nature of the programs the Defendants operate and the benefits those programs provide.

SOAR alleges a violation of Title II of the ADA, *see* (ECF 46) at ¶¶ 107–113, and Section 504 of the RA, *id.* at ¶¶ 114–121. Both provisions forbid the exclusion of disabled individuals from "participation in" a public program as well as the "deni[al] [of] the benefits of" such a program to an individual "by reason of … [their] disability." 42 U.S.C. § 12132; *cf.* 29 U.S.C. § 794(a). SOAR claims that West Virginians with opioid use disorder are "qualified to participate in and benefit from the state's licensing and zoning of health facilities," (ECF 46) at ¶ 111; *see also id.* at ¶ 119.[9] But, SOAR claims, the moratorium denies those West Virginians an "equal opportunity to benefit from" the State's "licensing and zoning of health facilities." *Id.* at ¶ 112; *see also id.* at ¶ 120. And thus, SOAR contends, the moratorium violates the ADA and RA.

**A.** This argument cannot survive close scrutiny. In constructing its argument, SOAR has committed two category errors. *First*, it overgeneralizes and mischaracterizes the programs at issue here. HCA does not operate an all-encompassing opioid treatment regime (or even, more narrowly, control the distribution of methadone); it "administer[s] the certificate of need program." W. Va.

[9] A "qualified individual with a disability" is someone "with a disability who, with or without reasonable modifications to rules, policies, or practices, the removal of architectural, communication, or transportation barriers, or the provision of auxiliary aids and services, meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity." 42 U.S.C. § 12131(2).

Code § 16-2D-3.[10] And *second*, SOAR has conflated negative downstream impacts with actionable discrimination. Indeed, despite SOAR's claim to the contrary, nothing precludes disabled individuals generally (and those with opioid use disorder specifically) from participating in and benefiting from *the actual program* that HCA operates.

Properly conceptualizing the government program at issue is an essential first step. A plaintiff must do more than identify a general and "amorphous objective"—such as "adequate health care"—when alleging disability discrimination. *See Alexander v. Choate*, 469 U.S. 287, 303 (1985). Instead, they must identify the particular "package of services" that they believe they are entitled to or seek to avail themselves of. *See Liberty Res., Inc. v. Philadelphia Hous. Auth.*, 528 F. Supp. 2d 553, 568 (E.D. Pa. 2007). That package may have a "general goal" of helping individuals achieve some grander objective—e.g., Section 8 housing vouchers are designed to help low-income Americans "locat[e] affordable housing"—but plaintiffs should not "misconstru[e]" that grander objective as the proper predicate of a discrimination claim. *Id.* A "violation of the ADA or RA only occurs when a disabled person is denied meaningful access to a benefit"—one of the discrete services—actually "provided by the program." *Id.* Participation in Section 8 requires an

---

[10] As discussed below, the same is true of OHFLAC. *See* Sect. II.B, *infra*; *see also* W. Va. Code § 16B-13-1 (declaring that the medication-assisted treatment licensure program, which OHFLAC administers, establishes "licensing and registration requirements for facilities and physicians that treat patients with substance use disorders.").

individual have access to the subsidy voucher; it does not mean that the government will guarantee the existence or availability of an affordable housing option.

Differentiating between the benefits of *a program* and downstream or secondary effects *associated with that* program is also critical. Neither the ADA nor RA guarantee an equality of outcomes between disabled and non-disabled individuals. *See Alexander*, 469 U.S. at 303–04; *see also id.* at 306 (explaining that a State "is not required to assure that its handicapped Medicaid users will be as healthy as its nonhandicapped users"). Nor do these statutes require States to provide particular substantive benefits or mandate an end result that state programs must achieve. *See Southeastern Cmty. Coll. v. Davis,* 442 U.S. 397, 410 (1979) (the "language and structure of the Rehabilitation Act … reflect[s] … the distinction between the evenhanded treatment of handicapped persons and affirmative efforts to overcome the disabilities caused by handicaps"). Instead, the ADA and RA represent a "nondiscrimination requirement with regard to the services [a State] in fact provide[s]." *Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581, 603 n.14 (1999); *see also Rodriguez v. City of New York*, 197 F.3d 611, 618 (2d Cir. 1999) ("The ADA requires only that a particular service provided to some not be denied to disabled people."). So long as a government program "provide[s] equal access to its core services … in a non-discriminatory manner then it has provided meaningful access to its benefits." *Liberty Resources*, 528 F. Supp. 2d at 567 (E.D. Pa. 2007).

**B.** A proper conceptualization of the programs that HCA and OHFLAC respectively administer, and who is eligible to participate in those programs reveals

why SOAR's claims miss the mark. The certificate of need program overseen by HCA is, at its core, an economic regulation—essentially a regulatory preapproval regime. Yes, it has an overarching, general goal of reining in the "problem of spiraling health care costs" and addressing "patterns of maldistribution in health care facilities and services." *Princeton Cmty. Hosp. v. State Health Plan.*, 174 W. Va. 558, 561, 328 S.E.2d 164, 167 (1985).[11] But it is the review and issuance of permission to operate—the grant or denial of the eponymous certificates of need—that is the primary service the program actually provides. *See* W. Va. Code § 16-2D-12. And while there are many factors considered by HCA when considering whether to issue a certificate, *see id.*; *see also* W. Va. Code § 16-2D-13, an individual's disability status isn't one of them. Disability status isn't relevant because the benefit the certificate of need program provides *isn't* the downstream medical treatment such a certificate may eventually facilitate. HCA doesn't evaluate whether *individuals need methadone*; it issues *permission to operate* to *businesses* when and if they satisfy the statutorily prescribed factors.

The same is true of the medication-assisted treatment licensing program overseen by OHFLAC. Its overarching goal is to help ensure that the people of West Virginia have access to "quality, safe treatment" for substance use disorders. W. Va. Code § 16B-13-1. But OHFLAC does not *provide* that treatment; it doesn't distribute

---

[11] *See also* W. Va. Code § 16-2D-1 (declaring that it is the public policy of the State that "the offering or development of all health services shall be accomplished in a manner which is orderly, economical and consistent with the effective development of necessary and adequate means of providing for the health services" and also critical to "avoid unnecessary duplication of health services, and to contain or reduce increases in the cost of delivering health services").

medicine or evaluate patients. Instead, the program that OHFLAC administers (medication-assisted treatment licensure) provides regulatory oversight. It reviews applications, inspects facilities, and then grants or denies licenses to providers who satisfy (or don't) statutory criteria. *See* W. Va. Code § 16B-13-3. And, as with HCA, disability status is not a criterion that is considered. *See*, *e.g.*, W. Va. Code §§ 16B-13-3(f), 16B-13-5, 16B-13-6. Likewise, the benefit of OHFLAC's medication-assisted treatment licensure program is the requisite permission an opioid treatment program (including a methadone-dispensing clinic) must obtain to operate, *not* the downstream medical treatment that program ultimately provides. As the relevant statute states, "[u]pon satisfaction that an applicant has met all of the requirements of this article, the director shall issue a license to operate an opioid treatment program." W. Va. Code § 16B-13-3(g). Possession of that license entitles a clinic operator to "possess, have custody, or control of, and dispense drugs indicated and approved by the United States Food and Drug Administration for the treatment of substance use disorders." *Id.* But clinical decisions—whether and how to treat patients, including what drugs to prescribe them—are made by the licensed provider, not OHFLAC.

SOAR's argument to the contrary requires this Court to zoom up and away from what the certificate of need and medication-assisted licensure programs are and what HCA and OHFLAC actually do. It requires this Court accept both SOAR's contention that methadone is "essential for the health of individuals who are impacted by drug use," *e.g.* (ECF 46) at ¶ 86 *and* its implicit suggestion that access

to that particular medical service is *a benefit* that *flows directly* from those programs, *e.g.*, *id.* at ¶ 112. But neither HCA nor OHFLAC operate methadone clinics or distribute methadone. They don't issue prescriptions that would allow an individual to obtain methadone. Instead, they grant businesses seeking to operate a medical facility (including methadone-dispensing opioid treatment programs) the predicate authorization needed to do so. Those businesses are the program participants, the statutory criteria supply the relevant qualifications they must meet, and a certificate of need and medication-assisted treatment license are the benefits HCA and OHFLAC provide.

Contending otherwise—SOAR's claim that *individuals with opioid use disorder* are participants in the certificate of need and medication-assisted licensure programs and that the ultimate receipt of methadone by such individuals is *the benefit of those programs*, *see* (ECF 46) at ¶¶ 111, 119—attempts to jam a square peg in a round hole. The ADA and RA ensure that disabled individuals have meaningful access to aid, benefits, and the services that the government actually provides and provide a cause of action when those have been denied. But this antidiscrimination mandate does not transform every downstream consequence of a regulatory regime into a government "benefit" that the denial or absence of (or unequal access to) gives rise to an ADA or RA cause of action. *See* 28 C.F.R. § 35.130(b)(6) (explaining that while a "public entity may not administer a licensing or certification program" in a manner that discriminates against the disabled, "[t]he programs or activities of

entities that are licensed or certified by a public entity are not, themselves, covered by this part").

Nor do SOAR's reasonable modification or methods-of-administration theories, *see* (ECF 46) at ¶¶ 112, 120, change the calculus. Neither changes the nature of the programs HCA and OHFLAC administer or the benefit flowing from those programs. SOAR has not identified any policy, practice, procedure, or method of administration employed by either HCA or OHFLAC that denies a qualified individual with a disability equal access to the certificate of need or medication-assisted treatment licensure program or any benefit flowing therefrom. Instead, SOAR's theories depend on the same fundamental category error identified above: treating downstream access to methadone furnished by privately operated clinics as a benefit HCA provides through administration of the certificate of need program and OHFLAC provides via administration of its licensure authority. SOAR's attempt to recast its theory as a failure to make a reasonable modification or as a discriminatory method of administration does not cure this fatal defect.

At bottom, because neither the ADA nor RA sweep as broadly as alleged, SOAR has not asserted a viable cause of action, and its claims must be dismissed.

## III. SOAR has not been the target of associational discrimination.

As outlined above, West Virginia's methadone moratorium does not discriminate against individuals with opioid use disorder; such individuals are not prevented from participating in or denied the benefits of either the certificate of need or medication-assisted treatment licensure program. But even if the moratorium does discriminate, that does not mean *that SOAR* is the proper party to pursue a

claim. After all, it is a venerable legal maxim that a "plaintiff generally must assert his own legal rights and interests" and "cannot rest his claim to relief on the legal rights or interests of third parties." *Warth v. Seldin*, 422 U.S. 490, 499 (1975); *see also Freilich v. Upper Chesapeake Health, Inc.,* 313 F.3d 205, 215 (4th Cir. 2002) (rejecting physician's attempt to pursue ADA and RA claims "on behalf of her dialysis patients"). SOAR cannot, therefore, carry the flag for disabled individuals who may have been discriminated against—for its case to move forward, SOAR must have a claim grounded in *its own right* to be free from discrimination.[12] No such claim exists here.

It is possible, of course, to allege associational discrimination. In such cases the plaintiff claims to have been subjected to discrimination "because of his relationship or association with a disabled person." *Fonner v. Fairfax Cnty.*, 415 F.3d 325, 333 (4th Cir. 2005); *see also* 28 C.F.R. § 35.130(g) (prohibiting associational discrimination). Precedent indicates, for example, that a methadone clinic can invoke associational discrimination to bring an ADA challenge to local zoning restrictions. *See A Helping Hand, LLC v. Baltimore Cnty.*, 515 F.3d 356, 358 (4th Cir. 2008); *see also*, *e.g.*, *MX Grp., Inc. v. City of Covington*, 293 F.3d 326, 335 (6th Cir. 2002) (methadone clinic that was "denied a zoning permit because it cares for and/or

[12] This Court previously concluded that SOAR had alleged an injury sufficient to convey Article III standing, *see* (ECF 33), but that does *not* mean SOAR has a viable claim. A plaintiff "may well have an injury-in-fact cognizable under Article III" and nevertheless be unable to "invoke the protection" of any statute to remedy that injury. *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 132 (2014).

associates with individuals who have disabilities" could pursue ADA relief "on its own behalf").

That said, the doctrine of associational discrimination does not give rise to a viable cause of action *in this case*. SOAR undeniably associates with disabled individuals. *See*, *e.g.*, (ECF 46) at ¶¶ 16, 19. But that association, by itself, is "not sufficient to state a claim for associational discrimination under the ADA." *Freilich*, 313 F.3d at 216. To make out an associational discrimination claim, SOAR must show that it was subjected to discrimination "*because of*" its "relationship or association with … disabled person[s]." *Fonner*, 415 F.3d at 333 (emphasis added); *see also*, *e.g.*, *Church Ekklasia Sozo Inc. v. CVS Health Corp.,* 2022 WL 1572732, at *5 (W.D.N.C. Feb. 25, 2022).

Nothing in the Complaint even remotely suggests SOAR has been subjected to discrimination *because of* its association with the disabled. At the threshold, it is important to remember that SOAR has alleged no direct interactions with either HCA or OHFLAC. SOAR has not, for instance, applied for a certificate of need or medication-assisted treatment license. Thus *SOAR* has not been refused participation in or denied the benefits of a program that the Defendants actually implement and oversee. *See* Sect. II, *supra*. That makes it effectively impossible for Defendants to have subjected SOAR to discrimination of *any kind*, including any possible discrimination predicated on SOAR's association with disabled individuals. The injury SOAR alleges is *well downstream* of the implementation of both the certificate of need and medication-assisted treatment licensure programs. *See* pp.

14–17, *supra*. And SOAR cannot save its claim by attempting to recast the benefits HCA or OHFLAC provides. *Id.* Ultimately, in the absence of *any* adverse action against it by Defendants, SOAR cannot point to adverse action that was predicated on—that is, *because of*—its association with disabled individuals.

*Helping Hand* provides an illuminating contrast. There, a for-profit methadone clinic (Helping Hand) sought to take over a Baltimore County site previously used as a medical office. 515 F.3d at 358. Although the clinic's owner was initially assured that there were no zoning obstacles to locating at the site (and Helping Hand obtained all required approvals needed to operate), after community members learned about the clinic and lobbied their local representatives, Baltimore County adopted a new ordinance—clearly aimed at Helping Hand—prohibiting methadone clinics from locating within 750 feet of any residence and requiring them to obtain a "special exception" to operate. *Id.* Baltimore County then moved to enforce its new ordinance, threatened daily fines if Helping Hand continued to operate, and refused to extend the benefit of a grace period included in the ordinance's text to the clinic. *Id.* at 360–61. Helping Hand responded with an ADA lawsuit. *Id.* at 361.

On appeal, the Fourth Circuit addressed whether "the Clinic [Helping Hand] c[ould] bring claims *on its own behalf* for injury it suffered because of its association with ADA-protected persons." *Id.* at 363 n.3 (emphasis in original). The Court held the clinic could because the ADA and its implementing regulations prohibit "local governments from discriminating against entities because of the disability of

individuals with whom the entity associates." *Id*. at 364. Given the "abundant uncontroverted evidence" that the "County Council knew of and legislated [enacted the new ordinance] in response to community opposition to [Helping Hand]," the Court had little trouble concluding that Helping Hand had been targeted *because of* its association with the disabled. *Id*. at 366.

Here, there is nothing to suggest that SOAR has been targeted in the manner that Helping Hand was. Even if this Court determines that West Virginia's moratorium discriminates against methadone clinics, SOAR has not—and cannot—establish that *it* has been subjected to unlawful discrimination and certainly cannot show that any such discrimination was *because of* its relationship with the disabled. In that universe, another plaintiff (perhaps the operator or prospective operator of a clinic) may have a viable cause of action. But it is hard to see how the Legislature could be deemed, via enactment of the moratorium, to have taken aim at SOAR (or a similarly situated entity) that would suffer at most an indirect and attenuated downstream impact.

## IV. SOAR's challenge to the zoning/siting requirements for methadone clinics, Section 16B-13-6(c), is not ripe.

Although SOAR's complaint focuses primarily on the methadone moratorium, it also levels an independent attack on W. Va. Code § 16B-13-6(c), which it characterizes as a "zoning restriction." *See*, *e.g.*, (ECF 46) at ¶¶ 9, 12, 30, 71, 83, 84, 86, 87; *see also* Prayer ¶ c.ii. (requesting the court enjoin Defendants from "enforcing the zoning restriction" against methadone clinics). Section 16B-13-6(c) provides that "medication-assisted treatment programs" (which encompass methadone clinics)

"shall not be located within one-half mile of a public or private licensed day care center or public or private K-12 school." W. Va. Code § 16B-13-6(c). SOAR asserts that Section 16B-13-6(c) "discriminates against people with disabilities" by regulating methadone clinics "more strictly than health facilities that treat nondisabled people" and further claims its enforcement causes an "ongoing injury" to its mission by "draining" SOAR of its "limited resources." (ECF 46) at ¶¶ 112, 113. That claim should not be addressed by this Court at this time because it is unripe.

Ripeness is a threshold aspect of justiciability. *Scoggins v. Lee's Crossing Homeowners Ass'n*, 718 F.3d 262, 269 (4th Cir. 2013). Ripeness doctrine ensures that federal courts adhere to Article III's bedrock "case or controversy" requirement and do not wade into and "adjudicate disputes that are 'dependent on contingent future events that may not occur as anticipated, or indeed may not occur at all.'" *Trump v. California*, 609 U.S. ---, 2026 WL 2473573, at *2 (2026) (per curiam) (quoting *Trump v. New York*, 592 U.S. 125, 131 (2020)). Ensuring a claim is ripe is especially important in the context of a challenge to a statute or regulation as doing so "prevent[s] the courts … from entangling themselves in abstract disagreements over administrative policies" and "protect[s] [governmental] agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties." *Abbott Laboratories v. Gardner*, 387 U.S. 136, 148-49 (1967).

"A claim should be dismissed as unripe if the plaintiff has not yet suffered injury and any future impact remains wholly speculative." *Virginia Dep't of State*

*Police*, 713 F.3d at 758. In circumstances where "an injury is contingent upon a decision to be made by a third party that has not yet acted, it is not ripe." *Id*.

SOAR's challenge to Section 16B-13-6(c) is not ripe for two reasons. *First*, it is entirely speculative that the restriction at issue would prevent new clinics from finding a suitable location and ultimately opening. *Second*, even if the restriction proved to be problematic, SOAR fails to account for the statutory provision that allows OHFLAC to grant a "waiver or a variance from any licensure or registration standard, or portion thereof" of the Medication-Assisted Treatment Program Licensing Act. *See* W. Va. Code § 16B-13-6(d).

As for the first reason, SOAR has not alleged—nor could it—that forbidding methadone clinics from locating within a half mile of a day care or school would prevent new clinics from opening. It is, of course, entirely possible that in the absence of the moratorium, operators would look for and find suitable sites for new clinics that fall outside of the half-mile restrictive zone. Indeed, that is why SOAR only alleges that enjoining Section 16B-13-6(c) would make it "*easier*" for operators to find "appropriate locations." (ECF 46) at ¶ 85 (emphasis added). But the mere possibility that suitable (and statutorily compliant) sites could exist illustrates that the injury SOAR attributes to the zoning restriction "may not occur at all." *California*, 2026 WL 2473573, at *2. Thus, the impact of the zoning restriction on SOAR is wholly speculative.

The provision allowing clinic operators to request a waiver of the zoning restriction further reinforces the contingent and speculative nature of SOAR's

challenge. It is impossible to know—before any clinic operator has even sought a waiver—when, if ever, OHFLAC would consider waiving the half-mile requirement. Indeed, it is impossible to know if operators will even *need* to seek a waiver; as indicated above, there may be suitable locations that satisfy Section 16B-13-6(c)'s location requirements. But even if the zoning restriction is, in effect, so onerous that it amounts to an effective ban on new methadone clinics, the existence of the safety valve provided by the waiver provision means SOAR's facial challenge remains entirely speculative. That is, until it is evident *both* that no (or almost no) suitable sites are available *and* that OHFLAC is unwilling to grant sufficient waivers, SOAR's claim that the zoning restriction meaningfully contributes to its asserted injury is conjectural *ipse dixit*. And, at this point in time, it is impossible to know *either*.

At bottom, SOAR's challenge to the zoning restriction is "riddled with contingencies and speculation that impede judicial review." *New York*, 592 U.S. at 131. That renders it unripe, which means this Court should not consider it at this time. And, given that SOAR is not *directly* impacted by the zoning restriction—it is not itself trying to find a suitable location, request a variance, or ultimately operate a clinic—declining to weigh in now exposes SOAR to minimal hardship. *See Ohio Forestry Ass'n, Inc. v. Sierra Club,* 523 U.S. 726, 733 (1998). Moreover, there remains "ample opportunity" to pursue a challenge to the zoning restriction at a later time, if the harm SOAR theorizes turns out to be "more imminent and more certain." *Id.* at 734. For now, this Court should dismiss that claim on ripeness grounds.

* * *

It is evident from the efforts described in its complaint that SOAR cares deeply about West Virginians impacted by the opioid crisis. That is commendable. It is also evident that SOAR has strong opinions regarding the policy prescriptions that should be followed to help ameliorate the crisis. Fervor for positive change is the lifeblood of a well-functioning republic.

Here, however, that fervor has been channeled to the wrong forum. SOAR's advocacy regarding the methadone moratorium is well-calibrated for the halls of the Legislature. But, couched as a request for legal relief in this forum, SOAR faces insurmountable obstacles.

## CONCLUSION

Defendants' motion for judgment on the pleadings should be granted.

Dated: October 5, 2026

Respectfully submitted,

**THE WEST VIRGINIA HEALTH CARE AUTHORITY, et al.,**

**By counsel,**

**JOHN B. MCCUSKEY,**
**ATTORNEY GENERAL**

/s/ Zachary A. Viglianco

Jace H. Goins (WVSB No. 7894)
*Chief Deputy Attorney General*
Zachary A. Viglianco (WVSB No. 12579)
*Director of Strategic Litigation*
Andrew T. Waight (WVSB No. 13276)
*Assistant Attorney General*

State Capitol Complex
1900 Kanawha Blvd, East
Office of the Attorney General

Charleston, WV 25314
Telephone: (304) 558-2522
jgoins@wvago.gov
zviglianco@wvago.gov
awaight@wvago.gov